962 F.2d 1556
 Eugene HASENFUS and Sally Hasenfus, Plaintiffs-Appellants,
v.
Richard SECORD, an individual, Corporate Air Services, a
Pennsylvania corporation; Southern Air Transport,
a Florida corporation; Albert Hakim, an
individual, Defendants-Appellees.
Kasanee SAWYER, an individual, Kasanee Sawyer,
Administratrix of Sawyer, Wallace B., Deceased,
Plaintiffs-Appellants,
v.
Richard SECORD, an individual, Corporate Air Services,
Southern Air Transport, a Florida corporation,
Albert Hakim, an individual, et al.,
Defendants-Appellees.
 Nos. 91-5106, 91-5107.
 United States Court of Appeals,
Eleventh Circuit.
 June 15, 1992.
 
 Brian R. Strange, Craig R. Spiegel, Strange & Hoey, Los Angeles, Cal., for plaintiffs-appellants in No. 91-5106.
 David M. Kirstein, Beckman & Kirstein, Washington, D.C., for defendants-appellees in No. 91-5106.
 Dwight Sullivan, Miami, Fla., Robert M. Beckman, Beckman & Kirstein, Washington, D.C., for Southern Air.
 Samuel B. Reiner, II, Thomas R. Spencer, Jr., Spencer & Klein, Miami, Fla., for Secord.
 Brian R. Strange, Craig R. Spiegel, Los Angeles, Cal., for plaintiffs-appellants in No. 91-5107.
 Dwight Sullivan, Miami, Fla., Robert M. Beckman, David M. Kirstein, Washington, D.C., Thomas R. Spencer, Jr., Samuel B. Reiner, II, Miami, Fla., for defendants-appellees in No. 91-5107.
 Appeals from the United States District Court for the Southern District of Florida.
 Before HATCHETT, Circuit Judge, JOHNSON* and HENDERSON, Senior Circuit Judges.
 HATCHETT, Circuit Judge:
 
 
 1
 We affirm the district court's ruling that Richard Secord, Albert Hakim, Southern Air Transport (SAT) and Corporate Air Services (CAS) are not liable to Eugene and Sally Hasenfus and Kasanee Sawyer for damages resulting from covert air missions to resupply the Nicaraguan "Contras."
 
 FACTS
 
 2
 In 1985, the United States Congress discontinued funding for the "Contras," a military force seeking to overthrow the Nicaraguan government. Soon thereafter, Oliver North, a United States Marine Corps lieutenant colonel and National Security Council aide, undertook to arrange covert funding for the Contra rebels. North solicited Richard Secord, a retired Air Force general, to organize an airlift to resupply the Contras. Secord deposited funds for the airlift operation into Swiss bank accounts over which he maintained discretion and control.
 
 
 3
 Secord engaged Richard Gadd to organize the airlift. Gadd worked with Southern Air Transport (SAT) and Corporate Air Services (CAS) in arranging various services required for the operation, such as maintaining aircraft and hiring personnel.
 
 
 4
 In early 1986, CAS hired Wallace B. Sawyer, Jr., an Air Force Academy graduate and an experienced combat pilot. William Cooper, also an experienced combat pilot, served as the "on-site manager" for the operation at Ilopango Air Base in El Salvador and as a pilot. Eugene Hasenfus, a former Marine paratrooper, joined the operation as an "air freight specialist."
 
 
 5
 Secord and his agents directed the air drops to Contras concentrated in the northern and southern parts of Nicaragua. The northern air drops were relatively easy, involved short distances, and could be undertaken at night. The southern air drops were far more difficult, required seven-hour round trips, and, for various reasons discussed later, were flown during the day.
 
 
 6
 During 1986, several successful air drops were completed. Around midday on October 5, 1986, however, Nicaraguan forces shot down a southern resupply flight with a heat-seeking missile. The missile strike killed Cooper, Sawyer, and a Contra aboard the flight. Hasenfus parachuted from the plane and survived, but Nicaraguan forces captured him the following day. Within three months, the Nicaraguan government tried, convicted, and pardoned Hasenfus. By Christmas, he was back home in the United States.
 
 PROCEDURAL HISTORY
 
 7
 Eugene and Sally Hasenfus and Kasanee Sawyer (appellants) sued Secord, his partner, Albert Hakim, SAT, and CAS (appellees).[1] The Hasenfuses' third amended complaint alleged: (I) breach of Eugene Hasenfus's written employment contract with CAS; (II) breach of an oral contract to pay Hasenfus's legal expenses arising from the trial in Nicaragua; (III and IV) intentional and negligent misrepresentation relating to the promise to pay Hasenfus's Nicaraguan legal expenses; and (V) conversion of Hasenfus's papers and personal effects in an attempt to cover-up the resupply operation. Sawyer's complaint alleged: (I) breach of an oral contract with CAS to pay salary, expenses, and a death benefit; (II) negligent failure to provide safe aircraft and required safety equipment; (III and IV) intentional and negligent misrepresentation contained in promises to provide safe aircraft and proper safety equipment; and (V) wrongful death as a result of the alleged negligence.
 
 
 8
 The district court dismissed the appellants' claims that the appellees were strictly liable for Hasenfus's injuries and Sawyer's death. At the close of all the evidence, the district court entered directed verdicts for appellees on the Hasenfuses' conversion claim and on Sawyer's negligence, misrepresentation, and wrongful death claims. Thus, the following claims went to the jury for special verdicts: (1) the Hasenfuses' written contract claim; (2) the Hasenfuses' oral contract claim relating to the promise to pay Eugene's Nicaraguan trial expenses; (3) the Hasenfuses' intentional and negligent misrepresentation claims relating to the promises to pay for Eugene's Nicaraguan trial expenses; and (4) Sawyer's claim that appellees breached an oral agreement to pay salary, expenses, and a death benefit. The jury found that SAT and Secord engaged in a joint venture, and that CAS and other persons acted as Secord's and SAT's agents. Nonetheless, the jury found for Secord and SAT on all liability issues.
 
 ISSUES
 
 9
 The issues presented are: (1) whether the trial court erred in entering directed verdicts for appellees on Sawyer's negligence and misrepresentation claims; (2) whether the trial court erred in its instructions to the jury on Hasenfus's contract and misrepresentation claims; (3) whether the trial court erred in the special verdict form submitted to the jury on Sawyer's contract claim; and (4) whether the trial court erred in denying appellees' motion for a directed verdict on joint venture and agency.
 
 DISCUSSION
 A. The Directed Verdicts
 
 10
 This court reviews de novo the district court's entry of a directed verdict. The district court should grant a motion for directed verdict if "the facts and inferences point overwhelmingly in favor of one party such that reasonable people could not arrive at a contrary verdict." Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir.1989). The court must consider "all the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party." Carter, 870 F.2d at 581. We may not affirm the district court's entry of a directed verdict if the record contains "substantial evidence" opposing the motion. Carter, 870 F.2d at 581. "A mere scintilla of evidence," however, is not sufficient to defeat the motion. Carter, 870 F.2d at 581; see also Boeing Co. v. Shipman, 411 F.2d 365, 374-75 (5th Cir.1969) (en banc).
 
 1. The Negligence Claim
 
 11
 Sawyer contends that she introduced sufficient evidence to defeat the motion for directed verdict on her negligence claim. Witnesses testified that the southern resupply missions could have been flown at night if the planes contained the proper navigation equipment, and that such night flights would have been "safer" than flying during the day. Sawyer also argues that appellees negligently failed to provide the crew with adequate safety equipment, such as parachutes and survival kits. Appellees respond that they were not negligent in equipping the plane or the crew. Alternatively, any negligence did not proximately cause Sawyer's death. Finally, appellees argue that they are not liable because Sawyer assumed the risk of death when he agreed to fly supply missions over hostile territory.
 
 
 12
 While the facts of this case are unusual, the legal principles we must apply are well established. To prevail in a negligence action, the plaintiff must show: (1) that the defendant owed a duty of reasonable care to the plaintiff; (2) that the defendant breached that duty; (3) that the breach was the proximate cause of the injury to the plaintiff; and (4) that the plaintiff suffered damages. See, e.g., Rupp v. Bryant, 417 So.2d 658, 668 n. 27 & accompanying text (Fla.1982); Reinhart v. Seaboard Coast Line R.R. Co., 422 So.2d 41, 43 (Fla.App.1982), petition den., 431 So.2d 989 (1983). Failure to establish any one of these elements is fatal to the plaintiff's case. See, e.g., Gooding v. University Hospital Bldg., Inc., 445 So.2d 1015, 1018 (Fla.1984) (defendant entitled to directed verdict because plaintiff failed to establish proximate cause, even though plaintiff established other elements of negligence case). Under Florida law, the plaintiff must introduce sufficient evidence from which a reasonable jury could conclude that the defendant's negligence was the probable cause of the plaintiff's injury. See Hessen v. Jaguar Cars, 915 F.2d 641, 647 (11th Cir.1990). The trial court may decide on a motion for directed verdict whether the plaintiff has introduced sufficient evidence to carry this burden before the jury:
 
 
 13
 [The plaintiff] must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture or the probabilities are at best evenly balanced it becomes the duty of the court to direct a verdict for the defendant.
 
 
 14
 Gooding, 445 So.2d at 1018 (quoting Prosser, Law of Torts § 41 (4th ed. 1971)). In this case, no reasonable person could conclude from the evidence presented that appellees' alleged negligence proximately caused Sawyer's death.
 
 
 15
 All of the witnesses testified that conditions in southern Nicaragua required that the air drops be made with pinpoint accuracy. Because of the dense jungle, supplies could be lost if the crew missed the drop zone by even the shortest distance. According to the testimony at trial, the only way to achieve the required accuracy was to fly over the drop zone at altitudes of 400 to 800 feet. Flying at such low altitudes exposed the planes to missile, anti-aircraft, and small arms fire.
 
 
 16
 The majority of the testimony at trial held that safety and accuracy considerations militated in favor of daytime resupply flights in southern Nicaragua. But Sawyer's witness, Elmo Baker, testified that he would have flown the missions at night if appellees had equipped his plane with an inertial navigation system (INS). Baker and another witness, James Wilburn, testified that night flights would have been "safer." At another point in his testimony, however, Baker stated that the risk of anti-aircraft and missile fire at low altitudes was the same whether the missions were flown during the day or at night.[2] Thus, appellants' witness established that the absence of an INS and the need to fly during the day did not proximately cause Sawyer's death. Rather, the most proximate cause of Sawyer's death was the need to fly low in order to hit the drop zones, thereby exposing the aircraft to missile fire. According to appellants' witness, the risk of such fire at low altitudes was the same, day or night. Thus, the absence of night navigation equipment had no impact on the relevant risk.
 
 
 17
 Only one witness, Wilburn, testified specifically that the plane was an easier target for surface-to-air missiles during the day.[3] At another point in his testimony, however, Wilburn stated that the risk of a successful missile attack was the same, day or night.[4] Two other expert witnesses testified at length that day flying offered an equal or better chance of survival against surface-to-air missiles than night flying.
 
 
 18
 Viewing this evidence in its entirety, we agree with the district court that appellants did not introduce substantial evidence that the absence of an inertial navigation system proximately caused Sawyer's death. The testimony of Baker and Wilburn raises the possibility that equipping the plane with an INS would have prevented it from being shot down. But Baker and Wilburn's other statements, and the consistent testimony of the other witnesses, showed that equipping the plane with an INS probably would not have reduced the risk posed by surface-to-air missiles. Because appellants' case raised no more than a possibility that appellees' negligence was the proximate cause of their injury, the district court was obligated to direct a verdict for appellees. Gooding, 445 So.2d at 1018.
 
 
 19
 Sawyer's negligence claim based on the purported lack of safety equipment similarly fails for absence of causation. Sawyer introduced no evidence that Wallace Sawyer would have survived the missile attack if he had been furnished a parachute and a survival kit. Indeed, the only relevant evidence in the record, Eugene Hasenfus's compelling eyewitness testimony, indicated that the other crew members had little chance to escape from the plane after the missile hit. Appellants' evidence did not raise the possibility, much less the probability, that Sawyer would have survived the crash if provided proper safety equipment. Similarly, appellants introduced no evidence that Hasenfus would have been rescued if provided with a radio.[5]
 
 2. Sawyer's Misrepresentation Claim
 
 20
 Sawyer contends that the district court erred in directing a verdict for appellees on her intentional and negligent misrepresentation claims. Sawyer argues that appellees induced her husband to continue flying Contra resupply missions with promises of airplane repairs and better safety equipment. According to Sawyer, her husband would not have continued to participate in the operation but for appellees' promises.
 
 
 21
 To prevail on her claim of intentional misrepresentation, Sawyer must show:
 
 
 22
 (1) a false statement of fact; (2) known by the defendant to be false at the time it was made and (3) made for the purpose of inducing the plaintiff to act in reliance thereon; (4) action by the plaintiff in reliance on the correctness of the representations; and (5) resulting damage to the plaintiff.
 
 
 23
 Stowell v. Ted S. Finkel Investment Services, Inc., 641 F.2d 323 (5th Cir. Unit B 1981) (applying Florida law); see also Royal Typewriter Co. v. Xerographic Supplies, 719 F.2d 1092, 1103 (11th Cir.1983). To prevail upon her claim of negligent misrepresentation, Sawyer must establish the same five elements with one modification. With respect to the second element, Sawyer need only show that appellees negligently failed to ascertain the truth or falsity of the representation. See Emerson Electric Co. v. Farmer, 427 F.2d 1082, 1087-88 (5th Cir.1970) (applying Florida law).
 
 
 24
 Like her negligence claim, Sawyer's misrepresentation claims fail for lack of proximate cause. To prevail on her misrepresentation claim, Sawyer must show that her husband's reliance on appellees' misrepresentations caused his death. See Stowell, 641 F.2d at 325. Viewing the evidence in the light most favorable to Sawyer, however, she proved only that appellees' misrepresentations induced her husband to continue working for C.A.S. The pilots made the decision to fly each mission. Sawyer does not claim that in making the decision to fly on October 5, 1986, her husband relied upon any representations about the condition of the plane. To the contrary, the evidence showed that Sawyer, an experienced combat pilot, knew the condition of the plane he flew. To the extent that the plane lacked important navigational equipment, Sawyer was fully aware of that fact. Thus, in undertaking the action that led to his death--embarking on the ill-fated mission--Wallace Sawyer did not rely upon any misrepresentation by appellees. Instead, he relied on facts fully within his knowledge. Because Sawyer cannot demonstrate a causal link between appellees' representations about improved equipment and Sawyer's decision to fly on October 5, 1986, Sawyer cannot prevail on her misrepresentation claim.
 
 
 25
 B. The Jury Instructions and Special Verdict Forms
 
 
 26
 Appellants contend that errors in the jury instructions and special verdict forms require a new trial. The Hasenfuses argue that the district court failed to instruct the jury on Eugene's oral contract claim and erroneously instructed the jury that the contract terminated on October 5, 1986. The Hasenfuses also argue that the district court failed to instruct the jury on their theory that Elliott Abrams and William Schofield, two State Department officials, acted as appellees' agents. Sawyer argues that the district court committed error in the special verdict form when it failed to ask specifically whether a contract existed between Sawyer and appellees' agents.
 
 
 27
 This court reviews the district court's denial of a motion for new trial for abuse of discretion. Blu-J, Inc. v. Kemper C.P.A. Group, 916 F.2d 637, 643 (11th Cir.1990). In reviewing jury instructions, we must "view the challenged instructions as part of the entire charge, in view of the allegations of the complaint, the evidence presented, and the arguments of counsel, to determine whether the jury was misled and whether the jury understood the issues." Johns v. Jarrard, 927 F.2d 551, 554 (11th Cir.1991) (quoting National Distillers and Chemical Corp. v. Brad's Machine Products, Inc., 666 F.2d 492, 497 (11th Cir.1982) (internal quotations omitted)). Special verdict forms must enable the jury to resolve essential facts logically and consistently. See Burger King Corp. v. Mason, 710 F.2d 1480, 1489 (11th Cir.1983), cert. denied, 465 U.S. 1102, 104 S.Ct. 1599, 80 L.Ed.2d 130 (1984).
 
 
 28
 The district court committed no reversible error in the jury instructions or special verdict forms. Contrary to the Hasenfuses' contentions, the district court carefully instructed the jury that it could find an oral agreement existed between Hasenfus and appellees. Moreover, the district court properly instructed the jury that the contract terminated the day the plane was shot down. While Hasenfus testified that he expected the benefits of his employment to extend beyond that date, he introduced no evidence that appellees made such promises.
 
 
 29
 Similarly, the district court did not err in refusing to instruct the jury that Schofield and Abrams were appellees' agents as a matter of law. The record evidence was insufficient to support such an instruction. In any event, the district court did not preclude the jury from finding that Schofield and Abrams were appellees' agents. The court's instruction asked whether "William Cooper or anyone acting for Corporate Air Services, Ltd. was an agent of the defendants." The court allowed the Hasenfuses to present all their evidence on the Schofield/Abrams agency issue, and it allowed them to argue it fully before the jury. Thus, the arguments and evidence, coupled with the instruction given, fairly presented this issue to the jury.
 
 
 30
 Finally, the district court did not err in the special verdict form on Sawyer's contract claim. The form first asked the jury to determine whether Cooper or CAS were agents of appellees at the time Sawyer signed the written contract. The form next asked the jury to determine whether a contract existed between Sawyer, on the one hand, and Secord or SAT, on the other hand. From the court's instructions on agency, and the jury's finding that Cooper and CAS were appellees' agents, the jury could conclude that the question about Sawyer's contract incorporated the possibility of an agreement between Sawyer and appellees' agents. In the context of the trial, the court's instructions did not fail to inform the jury that it could find an oral contract between Sawyer and appellees' agents.
 
 C. Joint Venture and Agency
 
 31
 Appellees' challenge to the district court's denial of their motion for a directed verdict on joint venture and agency is also without merit. The record contained sufficient evidence from which a reasonable jury could find joint venture and agency.
 
 CONCLUSION
 
 32
 For the foregoing reasons, the judgment of the district court is affirmed.
 
 
 33
 AFFIRMED.
 
 
 34
 JOHNSON, Senior Circuit Judge, concurring specially:
 
 
 35
 Although I agree with all of the results reached by the majority and most of the reasoning underlying those results, I write separately to note my disagreement with the majority's causation analysis regarding Sawyer's misrepresentation claims. See supra, opinion at 1561-1562. The majority states that, although it found evidence that Sawyer's husband would not have continued to work for the defendants but for the alleged misrepresentation, Sawyer had not established the requisite causal link between the alleged misrepresentation and her husband's death. According to the majority, Sawyer must prove that the alleged misrepresentation induced her husband's decision to board the precise flight that resulted in his death. In other words, even if Sawyer had demonstrated that her husband would not even have worked for the defendants at the time of his death absent the alleged misrepresentation, she would not have established a sufficient causal nexus. The majority cites no authority supporting the extremely onerous burden of proof that it imposes on Sawyer, and I can see no justification for it.
 
 
 36
 Nonetheless, I concur in the result because the ground asserted by the district court is sufficient to justify our affirmance of the directed verdict. The district court found no evidence whatsoever that the alleged misrepresentation was even uttered to Sawyer's husband, and Sawyer fails to cite this Court to any such evidence. Without evidence of this essential element, the directed verdict was proper.
 
 
 
 *
 See Rule 34-2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit
 
 
 [1]
 The Hasenfus and Sawyer cases were consolidated for trial. CAS and Hakim were dismissed for insufficient service of process
 
 
 [2]
 The following exchange occurred during Baker's cross-examination:
 Q. Now, am I correct that to make these drops that we've been discussing in Nicaragua for the equipment to land in a reasonable proximity to the drop zone the plane would have to come down to perhaps five to eight hundred feet?
 A. Yes, that's correct.
 Q. And would that expose the plane to ground fire from anti-aircraft guns, missiles?
 A. Yes.
 Q. And at five to eight hundred feet if there were Sandinista troops in the area it wouldn't make much difference if it was nighttime or daytime, would it?
 A. Not at that altitude.
 
 
 [3]
 Wilburn testified:
 You can still see further in the daytime than you can see at night and this poor soul that's carrying this missile around on his shoulder can see you a lot further in the daytime than he can see you at night. And with that in mind, I would much prefer personally to fly at night.
 
 
 [4]
 The following exchange occurred during Wilburn's cross-examination:
 Q. Mr. Wilburn, would the risk of a successful attack by a surface-to-air missile be different whether you're going in the daytime or the nighttime?
 A. The attack by the missile itself, no sir.
 
 
 [5]
 We do not consider Hasenfus's belated claim that Cooper negligently followed a flight path that increased the danger of missile attack. The claim first appeared in appellants' motion for a new trial. The district court either ignored the claim, which it was entitled to do under the circumstances, or grouped it with appellants' other negligence claims in ruling that appellants failed to demonstrate proximate cause