Niki A. LAWRENCE, Plaintiff,

v.

METRO DADE COUNTY, FLORIDA; et al., Defendants.

No. 90–cv–1830.

United States District Court, S.D. Florida.

Nov. 17, 1994.

Nunc Pro Tunc Oct. 25, 1994.

William Amlong, Karen Amlong, Fort Lauderdale, FL, for plaintiff.

Carol Anderson, Miami, FL, for defendants.

Rhea Grossman, Miami, FL, for Lamont and Seme.

Robert Ginsburg, Miami, FL, for Metro–Dade County.

## ORDER GRANTING JUDGMENT AS A MATTER OF LAW IN FAVOR OF DEFENDANT METRO DADE COUNTY

UNGARO–BENAGES, District Judge.

This cause is before the Court at the close of the Plaintiff's case-in-chief on the motion of Defendant Metropolitan Dade County for entry of judgment as a matter of law pursuant to Rule 50, *Fed.R.Civ.P.* For the reasons stated below the Court has concluded that the motion should be granted and that judgment should be entered absolving Defendant Metropolitan Dade County from liability in this case.

### Plaintiff's Evidence [1]

The relevant facts, viewed in the light most favorable to Plaintiff, are as follows:

---

1. Plaintiff's evidence consists of her own testimony, the live testimony of Sally Gross–Farina, Kenneth Harms, Dr. Norma Hanna, excerpts from deposition of Defendant Wayne Seme, and exhibits consisting of documents admitted in evidence.

The Plaintiff is a 47 year old female who has been employed by Metropolitan Dade County ("County") as a police officer in the Metropolitan Dade County Police Department ("MDPD") since 1973. Since her promotion in 1980, Plaintiff has held the position of Sergeant. (Ex. 33a)[2] In 1988, Plaintiff unsuccessfully requested that she be transferred to a Sergeant's position in the Canine Unit. (Ex. 3) Plaintiff had previously requested a transfer to the Canine Unit on three separate occasions, but had never been granted an interview. Shortly before the trial commenced, Plaintiff was relieved of active duty and placed on administrative leave with pay.

The County operates under a charter that establishes a "commission-manager" form of government. The charter grants the Board of County Commissioners general legislative and policymaking authority. The County Manager serves as the County's chief executive officer and head of the administrative branch of county government. The charter authorizes the County Manager to create and administer all units of county government under the Manager's jurisdiction. MDPD is within the jurisdiction of the County Manager and its head, the Director of Public Safety, reports to the County Manager. (Ex. 36, p. iv.)

In 1988, MDPD consisted of approximately 2000 employees working in various units described in MDPD's organizational chart as sections, divisions, districts, and bureaus. (Ex. 36, p. M-80) Among these units was the Special Patrol Bureau. The Special Patrol Bureau was under the command of Captain Dunphy and included certain specialized units such as the Special Response Team, mounted patrol and the Canine Unit. (Ex. 36, p. M-91) The Canine Unit was comprised of ten officers under the direct supervision of Defendant Wayne Seme.

Acceptance into a specialized unit is prestigious and can result in enhanced economic opportunities. For example, an officer working in the Canine Unit may have a greater opportunity to earn overtime pay. Further, an officer working in a specialized unit may learn skills which will enhance his or her employment opportunities after retirement from the police department.

Female officers generally perceived in the late 1970s and early 1980s that women were not welcome in the specialized units and that women were being excluded from the specialized units by means non-job-related eligibility tests, including physical fitness tests which required the completion of a rope climb. Rope climbing requires substantial upper body strength, is more difficult for women and is not job-related to positions in the Canine Unit, but may be job-related to positions on the Special Response Team ("SRT").

In 1984, the Plaintiff and other members of the Female Officers Association voiced their concern that they were being excluded from positions in the specialized units by means of tests which unfairly discriminated against women to the then County Manager Sergio Pereira and the then Director of Public Safety Bobby Jones. Director Jones then issued the following memorandum:

> There have been issues brought to my attention recently regarding the assignment of minorities to specialized units within the Metro–Dade Police Department. Specifically, it is perceived by minority and female representatives that discriminatory practices are being effected in association with the selection of personnel to specialized units which have resulted in the lack of equitable representation of Black, Latin and female officers in those units. Such practices are contradictory to the Department's policies and are not to be supported or condoned by concerned unit, bureau, or division commanders.

> In light of this restatement of departmental policy, all personnel desirous of being considered for specialized unit assignments are encouraged to submit appropriate transfer requests accordingly. Unit Commanders will be expected to maintain the position of selecting qualified individuals to fill existing or anticipated vacancies, however, will not arbitrarily exclude candidates

---

**2.** "Ex." refers to Plaintiff's exhibits. As no transcript of the testimony is available, the Court relies upon its recollection of the testimony and has also cited to Plaintiff's exhibits where applicable.

for reasons or screening processes not supported by validation or proven to be job related, particularly as they relate to females. (Ex. 9)

In 1986, the MDPD Management Analysis Bureau made a job-task analysis of the tests required of applicants to the Special Response Team and the Canine Unit. As part of that study, representatives of the Management Analysis Bureau attempted to ascertain the examinations then in use to establish eligibility for these units. According to a memorandum attached to the study, Defendant Seme, as the officer in charge of the Canine Unit, reported that although the rope climb was one of the several tests administered to applicants, the rope climb was not timed or scored and failure to complete the rope climb did not exclude an applicant from consideration. (Ex. 48) In fact, the rope climb test had been utilized for all candidates since 1982 (Ex. 42c, 52) and failure to complete the rope climb disqualified applicants from consideration for positions in the Canine Unit.

As part of its study, the Management Analysis Bureau also conducted extensive interviews with members of the SRT and Canine unit in order to determine and otherwise analyzed the precise physical demands of work performed in SRT and Canine. At the conclusion of the study the Management Analysis Bureau recommended, among other measures, that an outside consultant be used to develop two separate physical agility examinations for SRT and Canine Unit applicants and that such examinations be validated through a process to be developed by the outside consultant. The Management Analysis Bureau also suggested that applicants for SRT and the Canine Unit be required to demonstrate their physical ability to perform certain specific tasks. None of those tasks involved climbing a thirty foot rope. (Ex. 48)

In August, 1988, Defendant Seme had recently been promoted from sergeant to lieutenant and therefore, the sergeant's position in the canine unit was vacant. Accordingly, a notice of position vacancy for the position of "Police Sergeant Lead–Worker Canine (K–9) Handler" was distributed to all MDPD personnel. The notice stated:

Applications are now being accepted for an anticipated position vacancy in the Specialized Patrol Section, Canine Unit. Transfer requests should be submitted through channels prior to October 2, 1988. Applicants will be required to perform a physical fitness test.

Physical agility test will consist of traversing three obstacle courses, rope climb, push ups, sit ups, pull ups and a twelve minute run. All applicants should contact Rose Kemp of the Canine Unit at 681–3535 to be scheduled for the physical fitness test ... Applicants successfully performing the physical agility test will be scheduled at a later date for an oral interview.

The physical fitness test will be administered at Miami Dade Community college North Campus, Southeast Florida Institute of Criminal · Justice Building. All applicants are required to wear shorts and running shoes. (Ex. 1)

Plaintiff initially responded to the notice on August 26, 1988 by submitting a handwritten transfer request to her lieutenant. (Ex. 3) As explained by the Plaintiff, standard operating procedure in her unit was to submit a handwritten request to the lieutenant who in turn would have his secretary type it; once typed the transfer request would be returned to the officer seeking the transfer for signature and subsequent transmission "through channels." For reasons unexplained in the record, Plaintiff did not receive the typed transfer request from her lieutenant until September 28, 1988. She thereupon submitted the request "through channels", but it did not reach her ultimate superior until October 4, 1988. (Ex. 3)

Within a few days of submitting her handwritten request, Plaintiff attempted to contact Rose Kemp to schedule herself for the agility test described in the Notice of Position Vacancy. Initially, Plaintiff was advised that Rose Kemp was on vacation and to call back in two weeks. When Plaintiff finally reached Kemp two weeks later, Kemp advised her that the agility test would be given on October 12 and 14, 1988 at Miami Dade Community College (MDCC), North Campus and that Plaintiff should appear for the test on October 14th.

Toward the end of September, 1988, Plaintiff learned from a teletype message that Sergeant Greg Terp had been transferred to the Canine Unit. Plaintiff thereupon contacted Captain Dunphy to determine whether the Sergeant's position in the Canine Unit had been filled by Sergeant Greg Terp and, if so, what had happened. Captain Dunphy advised her that Sergeant Terp would be functioning temporarily as the Sergeant in Canine and that, in any event, he strongly encouraged her to pursue a sergeant's position in Canine because a third squad was planned for the near future. In fact, by the time Plaintiff spoke to Captain Dunphy the decision had been made to permanently assign Sergeant Terp as Sergeant of the Canine Unit, although his transfer was not effective until October 3, 1988.

On October 3, 1988, Plaintiff filed a grievance through the Dade County Police Benevolent Association ("PBA"). In her grievance, she complained that she had attempted to respond to the position vacancy by scheduling the physical fitness test through Rose Kemp, but that on September 16, 1988, before she could take the test, she had seen a teletype message revealing that Sergeant Terp was being assigned to the Canine Unit. She further complained that she spoke to Captain Dunphy on September 26, 1988, that Dunphy had confirmed that Sergeant Terp had been transferred to the Canine Unit, and that to her knowledge no interviews had been conducted. Plaintiff asserted in her grievance that the selection of Sergeant Terp violated the policy of the MDPD to promote and assign personnel on the basis of merit and fitness and Administrative Order 2.21 ("Favoritism or discrimination for any cause or reason, or because of race color, religion, sex or national origin will not be tolerated."). As a remedy, Plaintiff requested "... an opportunity to interview for the Canine Unit *Sergeant* Supervisor position, and grant me an interview with the unit Commander in the event I am not selected." (Ex. 42a)

On October 14, 1988, Plaintiff appeared at MDCC, North Campus, to take the agility test and reported to Defendant Seme. Plaintiff was already acquainted with Defendant Seme because, as a canine handler, he had assisted at Plaintiff's crime scenes from time to time. On one of these occasions, Plaintiff had remarked to Defendant Seme that she was interested in a position in the Canine Unit. According to Plaintiff, Seme had responded "I don't think so." Defendant Seme had also stated to Plaintiff that he did not think women should be police officers.

Also present to take the agility test were several male officers seeking a non-supervisory position in the canine unit. In the presence of the male officers, Defendant Seme asked Plaintiff what she was doing at the agility test, complained that she was not on his list of applicants and was otherwise verbally hostile to the Plaintiff. Nonetheless, Plaintiff was allowed to participate in the testing process.

Defendant Seme administered the test to all of the applicants as a group. As applicants failed parts of the test, they were disqualified. (Ex. 53) Plaintiff successfully completed the pull-up and sit-up portions of the test, and then moved on with the group into the gym for the rope-climb. The rope climb required that each applicant climb a thirty foot rope suspended from the ceiling, while another applicant held the bottom of the rope. As each male applicant climbed the rope, the other applicants cheered and encouraged him on. However, when the Plaintiff attempted to climb the rope, there was complete silence in the gym.

Defendant Seme gave Plaintiff two opportunities to climb the rope, but she was unable to do so. Plaintiff recalls that after her second attempt, Defendant Seme said to Plaintiff, "You're out of here" or words to that effect. The Plaintiff then requested permission to complete the remaining portions of the test, but Defendant Seme refused. Plaintiff was thereby disqualified from consideration for the position of sergeant in the Canine Unit.

Sometime in 1989, Plaintiff's grievance was granted to the extent that she was granted an interview. (Ex. 42d, 42e) However, Plaintiff never scheduled an interview because she believed that sitting for the interview would be futile in light of the fact that Sergeant Terp had transferred into the canine unit. Between 1975 and 1988, women sought posi-

tions in the Canine Unit with the following results:

POS = Number of positions

F = Number of female applicants

M = Number of male applicants

TOT = Total number of applicants

| YEAR | POS | F | M | TOT | COMMENT |
|------|-----|---|---|-----|---------|
| 1975 | 2 | 0 | 2 | 2 | |
| 1979 | 3 | 2 | 37 | 39 | Two males and one female selected. No test required. |
| 1981 | 5 | 1 | 28 | 29· | All positions were for airport Bomb Squad. All males chosen. No fitness test required. |
| 1982 | 5 | 3 | 20 | 23 | All males selected. Two women failed to appear either for interview or fitness test. |
| 1984 | 1 | 1 | 17 | 18 | Male selected. · The one female applicant failed to appear either for interview or fitness test. |
| 1985 | 3 | 0 | 14 | 14 | All males selected. |
| 1988 | 1 | 0 | 22 | 22 | |

(Ex. 42(c), 51)

### LEGAL STANDARD

 The legal standard by which a trial court is to evaluate a motion for judgment as a matter of law pursuant to Rule 50, *Fed. R.Civ.P* is well established. *E.g. Hasenfus v. Secord*, 962 F.2d 1556, 1559 (11th Cir.1992) The district court should grant a motion for judgment as a matter of law if "the facts and inferences point overwhelmingly in favor of one party such that reasonable people could not arrive at a contrary verdict." *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989). The Court must consider "all the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party." *Carter*, 870 F.2d at 581. The district court's may not enter a directed verdict if the record contains "substantial evidence" opposing the motion. *Carter*, 870 F.2d at 581. "A mere scintilla of evidence," however, is not sufficient to defeat the motion. *Carter*, 870 F.2d at 581; *see Boeing Co. v. Shipman*, 411 F.2d 365, 375–75 (5th Cir.1969) (en banc).

### LEGAL ANALYSIS

Plaintiff asserts that the County violated her civil rights under the Fourteenth Amendment of the United States Constitution, pursuant to 42 U.S.C. § 1983 by "intentionally excluding women for the special units such as the Canine Unit." Complaint, Paragraph 31. The County argues that Plaintiff has failed to introduce any competent evidence· to show that her exclusion from the Canine Unit was the result of a County custom or policy.

In *Monell v. New York City Dep't of Soc. Serv.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978), the United States Supreme Court held that local government units could be held liable for deprivation of federal rights in violation of 42 U.S.C. § 1983. However, such liability attaches *only* when a constitutional deprivation occurs pursuant to a municipality's "official policy." *Id.* at 694, 98 S.Ct. at 2037. Thus, under *Monell*, "recovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality', that is acts which the municipality has officially sanctioned or ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986).

. Subsequent to *Monell*, the Eleventh Circuit explained how these general principles apply to § 1983 actions alleging discriminatory employment practices. *Brown v. City of Fort Lauderdale*, 923 F.2d 1474 (11th

Cir.1991). The court stated that a public employee can establish municipal liability under § 1983 in either of two ways: (1) by showing that the decisionmaker possessed "final authority to establish municipal policy with respect to the action ordered." *Brown*, 923 F.2d at 1480 (quoting *Pembaur*, 475 U.S. at 481, 106 S.Ct. at 1299); or (2) by showing that her injury was the result of a municipal custom, defined as "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law." *Brown*, 923 F.2d at 1481 (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988) and quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1613–14, 26 L.Ed.2d 142 (1970)).

 Plaintiff seeks to hold the County liable solely on the basis of municipal "custom." Under this theory, the Plaintiff must prove a longstanding and widespread practice that is deemed authorized by policymaking officials because they must have known about it and failed to stop it. *Brown*, 923 F.2d at 1481 (a Section 1983 plaintiff relying on policy **or** custom must "show that a **policymaker** is responsible ... through acquiescence, for the custom"); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990); *Depew v. City of St. Mary's, Georgia*, 787 F.2d 1496, 1499 (11th Cir.1986) (to establish municipal liability, "actual or constructive knowledge of the allegedly unlawful customs must be attributed to the governing body of the municipality"). Random acts or isolated incidents are usually insufficient to establish a custom or policy. *Depew* at 1499. Further, the custom or policy must be the moving force of the constitutional violation at issue. *Samples on behalf of Samples v. City of Atlanta*, 846 F.2d 1328, 1333 (11th Cir. 1988). Even if a custom exists, a plaintiff must prove that there is a causal link between the custom of policy and the constitutional deprivation. *Parker v. Williams*, 862 F.2d 1471, 1477 (11th Cir.1989).

 Initially, the Court notes that the Plaintiff has failed to demonstrate that she was excluded from the Canine Unit in 1988 as a result of a custom to exclude women from the specialized units generally, as opposed to the Canine Unit specifically. The only testimony that supports the assertion that women were not allowed to work in the special units is the testimony of Sally Gross Farina, a former police officer, who testified that in the late 1970s female officers perceived that they were not welcome in the special units and Plaintiff's testimony that in 1984 she and other members of the Female Officer's Association brought their concerns to the County Manager and Director of Public Safety. This evidence is plainly insufficient to establish that a widespread practice or custom to exclude women from the specialized units actually existed within MDPD in 1988 when the Plaintiff requested that she be transferred to the Canine Unit. *Compare, Busby v. City of Orlando*, 931 F.2d 764, 782 (11th Cir.1991) (trial court correctly directed verdict for police chief who was only generally aware of complaints of racial discrimination at airport and that officers had used racial epithets).

 With respect to the Canine Unit specifically, Plaintiff additionally offered her own experiences in seeking a transfer to the Canine Unit and historical evidence that women have been unsuccessful in gaining admission to the Canine Unit. This historical evidence showed that between 1975 and 1988, one hundred and fifty-seven applicants, of whom seven were women, sought twenty positions in the Canine Unit; that three of the seven women had failed to appear either for the agility test or the interview; and that only one female was hired. Although Plaintiff proved that the rope climb test had been in use since 1982 (Ex. 42c) the Plaintiff was unable to offer any proof that the one female applicant other than herself who actually pursued a position in the Canine Unit between 1982 and 1988 had failed the rope climb and thereby been disqualified from further consideration.[3] In other words, the

---

**3.** According to Plaintiff's proof, four women other than her self sought positions in the Canine Unit between 1972 and 1988. However, three of these women were "no shows" for either the fitness test or the interview.

Plaintiff proved, apart from her own experiences, only a handful of isolated and unrelated incidents and she was unable to tie those incidents to gender discrimination. *Compare, Gray v. Dane County*, 854 F.2d 179 (7th Cir.1988); *Hamilton v. Rodgers*, 791 F.2d 439 (5th Cir.1986); *Wing v. Britton*, 748 F.2d 494 (8th Cir.1984); *Lopez v. City of Austin*, 710 F.2d 196 (5th Cir.1983).

▇ Assuming arguendo, however, that this evidence reflects that the Canine Unit customarily excluded women from its ranks, the County cannot be held liable for the employment practices in the Canine Unit unless those practices were sufficiently widespread or pervasive that the County's responsible policymakers had actual or constructive knowledge of them and acquiesced in them. In *Praprotnik*, the Supreme Court held that "the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area of the city's business." In *Jett v. Dallas Independent School District*, 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989), the Supreme Court held that it is "the trial judge [who] must identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused a particular constitutional or statutory violation at issue". Identification of the final policymaker is to be made from an examination state and local law. *Mandel v. Doe*, 888 F.2d 783 (11th Cir.1989).

The Court finds that in 1988 neither Defendant Seme, Captain Dunphy, nor even Director Taylor had final policymaking authority to establish eligibility requirements for positions in the Canine Unit. The Dade County Charter authorizes the Board of County Commissioners to pass ordinances and resolutions, including rules and regulations concerning county employment. Metropolitan Dade County Charter § 1.01.A., § 4.05. The County Manager oversees the administration and operations of all units under his jurisdiction, including MDPD, and appoints a Personnel Director who administers "the personnel and civil service programs and the rules governing them." Metropolitan Dade County Charter § 4.05 B. Although the Director of Public Safety has been delegated the authority to establish specific employment policies for MDPD, his decisions are clearly constrained by ordinances and resolutions passed by the Board of County Commissioners and administrative orders and policies promulgated by the County Manager. Ex. 36, Departmental Manual, 1988, 1988. Part I, p. iv.[4]

There is simply no competent evidence in the record on which the Plaintiff might rely to show that the County Manager, the Personnel director, or for that matter, any County official above the rank of Captain Dunphy had any knowledge or any reason to know that the Canine Unit—a ten man unit within a workforce of thousands—was customarily excluding women in 1988. While the evidence shows that in 1984 Plaintiff and other members of the Female Officers Association met with the County Manager and the Director of Public Safety to "voice" their concerns that women were being unfairly excluded from the special units, the evidence also shows that Director Jones, the then Director of Public Safety immediately issued a memorandum reaffirming departmental policy that applicants for positions in the special units *not* be excluded for reasons "not supported by validation or proven to be job related, particularly as they relate to fe-

---

4. Compare, *Feliciano v. Cleveland*, 988 F.2d 649 (6th Cir.1993) (City's Chief of Police was not the city's final policymaker in employment related matters); *Gillette v. Delmore*, 979 F.2d 1342 (9th Cir.1992) (Fire Chief was not city's final policymaker in employment of firefighter); *Manor Healthcare Corp. v. Lomelo*, 929 F.2d 633 (11th Cir.1991) (City could not be held liable for acts of mayor because his decisions were subject to review by city council); *Crowley v. Prince George County*, 890 F.2d 683 (4th Cir.1989) (County could not be held liable for discriminatory acts of Police Chief, although he was responsible for personnel decisions in his department, because the city charter gave the city council and the city's Chief Executive Officer the authority to establish and administer the personnel system and required "that all personnel decisions be based on merit and fitness"); *Auriemma v. Rice*, 957 F.2d 397 (7th Cir.1992) (Superintendent of police department was not a policymaker despite his status as "the apex of a bureaucracy" because he did not have the authority to establish city employment policy).

males." The record further reflects that the Management Analysis Bureau investigated the screening process for the Canine Unit and determined that the offending rope climb test was not being used to exclude women applicants from the Canine Unit. While its conclusion apparently was erroneous, there is no evidence in the record to suggest that any responsible County policymaker knew or should have known of that fact. *Cf., Brown* at 1481 (Plaintiff sufficiently alleges a "custom" of racial discrimination in the Ft. Lauderdale Police Department by alleging a series of discriminatory practices and knowledge and acquiescence in those practices by the Police Chief); *Church v. City of Huntsville,* 30 F.3d 1332, 1346 (11th Cir.1994) (the fact that a study was commissioned by an unidentified city department does not demonstrate that the official policymakers were aware of its content).

In fact, official County policy was that all employment decisions within the county were to be made on a gender-neutral basis. Article 5 of Chapter 11A of the Metropolitan Dade County Code states:

**Declaration of Policy**

It has been and is the policy of Metropolitan Dade County to provide equal employment opportunity to all without regard of race, sex, color, national origin, religion, age, physical handicap, ancestry, marital status and/or place of birth.

It has been and is further its policy to protect and safeguard individuals recruited, selected and hired within the County employment system by promoting and maintaining equal employment opportunity by means of affirmative action.

The County Manager sought to implement that policy through the issuance of Administrative Orders, including County Administrative Order No. 7–6, *Personnel Policy on Equal Employment Opportunity,* states:

(a) The County's policy includes the responsibility for ensuring that hiring qualifications for both entry and experience level jobs are fair and shall continue to be fairly administered. These qualifications are subject to regular review to assure that they conform to the actual job perfor-

mance requirements and to changing and novel situations.

\* \* \* \* \* \*

(b) Tests which may be administered by the County shall be only those that will measure the skills actually required for the job. Tests or tools are employed solely to aid in the selection of the right person for the right job. Tests shall conform to applicable legal regulations and shall be appropriately validated.

(c) All tests given to applicants shall be administered and evaluated by qualified employees who are fully acquainted with county policy as to equal employment opportunity.

and Dade County Administrative Order No. 7–6:

Candidates for promotion are chosen on the basis of existing or forecasted job openings and on their qualifications and work record—without regard to sex, race, color, religion and national origin.

The MDPD's internal policies were required to conform to County policy and, in fact, they did. For example, MDPD Administrative Order 2–21 from the 1988 Departmental Manual states:

I. BACKGROUND: The Metro–Dade Police Department is an equal opportunity employer and must ensure that continued affirmative action is taken at all levels of management and supervision to eliminate discrimination in personnel practices and procedures. Understanding and support of this program is of utmost importance.

II. POLICY: The Policy of the Department shall be to appoint, promote, assign, or transfer personnel solely on the basis of merit and fitness. Favoritism or discrimination for any cause or reason, or because of race, color or national origin will not be tolerated.

III. ACTION: Supervisory or administrative personnel, whose duties encompass job assignments shall routinely review the applicable and relevant personnel practices to assure that assignments are based solely upon valid job requirements. \* \* \*

Similarly, MDPD Administrative Order No. 2–46 of the same Manual states:

D. Filling Vacant Positions: Vacant positions will be filled with the most qualified candidates available in compliance with departmental affirmative action guidelines consistent with federal, state and local equal employment opportunity laws and regulations.

Plaintiff argues that her evidence shows that these policies were merely precatory. The Court disagrees. The evidence showed that the County Manager had acted through his subordinate, the Director of Public Safety, to address the concerns of the female officers that they were being unfairly excluded from the special units, including Canine, and that appropriate steps were taken to ascertain and validate the eligibility criteria for the canine unit. Thus, the only conclusion that a reasonable fact-finder could have reached from the evidence presented by Plaintiff was that the responsible policymakers acted consistently with County policy to eliminate discrimination on the basis of gender within it departments, including MDPD.

Accordingly, it is hereby

ORDERED AND ADJUDGED that final judgment is hereby entered in favor of Defendant Metro–Dade County and Plaintiff shall go hence without delay.

DONE AND ORDERED.