**In re: AMTRAK "SUNSET LIMITED" TRAIN CRASH IN BAYOU CANOT, ALABAMA, ON SEPTEMBER 22, 1993**

No. MDL 1003,
No. 94–5000–RV–C.

United States District Court,
S.D. Alabama,
Southern Division.

Aug. 9, 1999.

As Amended Aug. 17, 2000.

Lanny S. Vines, Esq., Emond & Vines, Birmingham, AL, Gregory B. Breedlove, Esq., Lead Counsel for Plaintiffs, Member—Plaintiffs' Steering Committee, Mobile, AL, Stephen D. Heninger, Esq., Lead Counsel for Plaintiffs, Member—Plaintiffs' Steering Committee, James J. Thompson, Jr., Esq., Lead Counsel for Plaintiffs, Member—Plaintiffs' Steering Committee, Birmingham, AL, Martin H. Levin, Liaison Counsel for Plaintiffs, Levin, Middlebrooks, Pensacola, FL, Turner W. Branch, Plaintiffs' Steering Committee, Branch Law Firm, Albuquerque, NM, J. Michael Papantonio, Plaintiffs' Steering Committee Levin, Middlebrooks, Pensacola, FL, L. Andrew Hollis, Jr., Esq., Plaintiffs' Steering Committee, Birmingham, AL, Frank Granito, III, Esq., Plaintiffs' Steering Committee, New York City, Steven A. Martino, Esq., Jackson, Taylor & Martino, Mobile, AL, Liaison Counsel for Plaintiffs,

Broox G. Holmes, Sr., Esq., Mobile, AL, Lead Counsel for Defendants W & GN, Et Al, John W. Vardaman, Jr., Esq., Washington, DC, Co–Lead Counsel for Defendants CSX, Et Al, Jerry A. McDowell, Esq., McDowell Knight Roedder & Sledge, L.L.C., Mobile, AL, John P. Coale, Coale,Cooley,Lietz,McInerny & Broadus, Washington, DC, Larry U. Sims, Esq., Sims, Graddick & Dodson, P.C., Mobile, AL, James W. Hill, Esq., Hirsch Robinson, Houston, TX, William E. Andrews, III, Esq., Purvis, MS, Richard R. Rosenthal, Esq., Birmingham, AL, for Defendants.

## AMENDED ORDER NO. 201

VOLLMER, District Judge.

This matter is before the court on the following documents:

1. "Motion for Summary Judgment on Claims Against The National Railroad Passenger Corporation," (doc. 1066), together with a supporting memorandum and evidentiary material, (doc. 1067), filed by defendant The National Railroad Passenger Corporation d/b/a Amtrak (Amtrak) as to all claims asserted against it by the Warrior & Gulf Navigation Company defendants (collectively "WGN") and by all plaintiffs;

2. Response, (doc. 1085), filed by the Plaintiffs' Steering Committee (PSC);

3. Response, (doc. 1092), together with evidentiary material, (doc. 1093), filed by WGN;

4. Reply, (doc. 1098), filed by Amtrak;

5. "Submission of Supplemental Authority," (doc. 1289), filed by Amtrak;

6. Supplemental Brief, (doc. 1345), filed by the PSC "on behalf of plaintiffs with Federal Employers Liability Act (FELA) claims";

7. Supplemental Brief, (doc. 1346), filed by the PSC;

8. Supplemental Brief, (doc. 1350), filed by WGN;

9. Response to PSC's FELA claim arguments, (doc. 1361), filed by Amtrak; and

10. "Response to Attempt by the PSC and WGN to Create a New Cause of Action Against Amtrak for the CSXT Railway," (doc. 1362), filed by Amtrak.

Having considered the briefs, the evidentiary material, the arguments of counsel, the original and updated proposed findings of facts and conclusions of law filed by defendant Amtrak pursuant to Local Rule 7.2, and having considered the pleadings and other relevant material in the record, the court finds that no genuine issue of material fact exists with respect to

Amtrak and that Amtrak is entitled to judgment as a matter of law on all of the claims asserted against it by all plaintiffs and by defendant WGN pursuant to Federal Rule of Civil Procedure 56. Accordingly, it is

ORDERED that the motion for summary judgment is GRANTED. The court finds that the following material facts are undisputed and, based on those facts, makes the following conclusions of law.

## UNDISPUTED FACTS

### Background/Events Giving Rise to These Actions

1. In the early morning of September 22, 1993, certain barges in the tow of the M/V MAUVILLA struck the railroad bridge over Bayou Canot (the "Striking"). RA 7.[1] WGN owned and operated the M/V MAUVILLA and the tow of barges that struck the bridge. RA 6.

2. The Striking displaced the bridge's through-plate girder span and tracks in the westerly (upstream) direction such that the easterly steel girder of the span was moved into the path of oncoming northbound trains. RA 8.

3. Shortly after the Striking, the northbound Sunset Limited struck the east girder of the Bayou Canot bridge and derailed at approximately 2:53–2:54 a.m., CDT, on September 22, 1993 (the "Casualty"). RA 16.

4. Neither Amtrak nor CSX received any warning before the Casualty that the M/V MAUVILLA's tow had struck and displaced the Bayou Canot bridge and tracks. RA 14, 15.

5. In the Casualty, three locomotives (Nos. 819, 262, 312), a baggage car (No. 1139), a crew dormitory car (No. 39908), and two passenger coaches (Nos. 34083 and 34068) derailed into or at the edge of Bayou Canot. RA 18. One passenger coach (No. 34040), the lounge car (No. 39973), the diner (No. 38030), and the sleeper (No. 32067) remained on the Bayou Canot bridge and railroad roadbed. RA 19.

### Federal Regulations Regarding Train Speed

6. As of September 22, 1993, the railroad track at Bayou Canot was a Class 4 track. RA 54.

7. Pursuant to federal regulations (49 C.F.R. § 213.9(a) and 49 C.F.R. § 236.0(d)), the maximum allowable operating speed for passenger trains without automatic train control or cab signals on a Class 4 track is 79 mph. RA 55.

8. The Sunset Limited was traveling between 72–74 mph [2] when it encountered the displaced bridge girder span and track at Bayou Canot. RA 58, 59.

### Federal Regulations and Official Records Regarding the Cars and Locomotives

9. At the time of the Casualty, the three passenger coaches on the Sunset Limited (Nos. 34040, 34068, and 34083) were each equipped with at least four emergency windows and two end doors on the upper level, and at least two emergen-

---

1. "RA" refers to the responses of WGN and the PSC to the Requests for Admission served by Amtrak and CSX. The relevant requests and responses accompanied Amtrak's summary judgment motion as Exh. A.

2. Amtrak contends that the train was traveling at approximately 72 mph. The PSC admits that the train was traveling at approximately 72 mph, while WGN admits that the speed was approximately 72–74 mph (apparently due to its reading of the NTSB event recorder factual findings). Because all parties admit that the speed was under 80 mph, and thus in compliance with federal regulations, the precise speed below 80 mph is irrelevant for purposes of this ruling.

cy windows on the lower level. RA 65, 66. The crew dormitory car (No. 39908) was equipped with an emergency window in each sleeping compartment of the car, and emergency windows in the coach section of the car. RA 67, 68. The sleeping car (No. 32067) was equipped with an emergency window in each sleeping compartment. RA 74.

10. In January 1984 (more than nine years prior to the Casualty), the United States Secretary of Transportation submitted an official report to Congress pursuant to the requirements of section 202 of the Federal Railway Safety Act of 1970, as amended in 1983. *See* Exh. H, U.S. Dep't. of Transp., *Railroad Passenger Equipment Safety: A Report to Congress* (1984) ("DOT Report").[3]

11. The DOT Report "presents the results of the Federal Railroad Administration's ["FRA's"] comprehensive examination of railroad passenger safety in response to section 702 of the Rail Safety and Service Improvement Act of 1982." DOT Report, at ii.

12. In the course of its study, the FRA "reviewed all applicable regulations, guidelines, and research on passenger equipment and operations … [and] considered relevant recommendations of the National Transportation Safety Board." DOT Report, at 1. More specifically, the FRA considered each of the following areas of passenger railroad safety: "car body structure," *id.* at 22; "flammability and smoke emission," *id.* at 23; "toxicity of materials," *id.* at 25; "interior design," including "design and securement of seats, luggage retention, and interior contouring," *id.* at 26; "emergency systems," including "lighting, communications, exits," *id.* at 26–27; "emergency procedures," *id.*

at 28; and "public awareness efforts," including passenger briefings and safety demonstrations, *id.* at 30.

13. After completing its comprehensive review of these passenger railroad safety matters, the FRA concluded that "[r]ail passenger service in the United States has compiled an outstanding safety record." *Id.* at 32. It found regulatory action appropriate in two areas—neither relevant here—and declined to take regulatory action in any of the areas referred to in the preceding paragraph. *See id.* at 32–33.[4]

14. WGN has not identified any experts to support its claims concerning the speed of the train and the Sunset Limited cars and locomotives. *See* Exh. F, WGN Expert Designation (May 1, 1995).

15. The PSC has not identified any experts to support plaintiffs' claims concerning the speed of the train, and the PSC withdrew the only expert it identified to support plaintiffs' claims concerning the Sunset Limited cars and locomotives. *See* Exh. G, PSC Expert Designation (Mar. 29, 1995) (accompanied by C.V. of R. Swint and letter confirming withdrawal of same).

**Bayou Canot Railway**

16. At the time of the Casualty, the Bayou Canot railway—bridge, track, and rails—was owned and operated by defendant CSX Transportation, Inc.

### CONCLUSIONS OF LAW

**Jurisdiction and Venue**

1. The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Venue is proper pursuant to 28 U.S.C. § 1391(b).

**Summary Judgment Standard**

2. As the Court of Appeals for the Eleventh Circuit cogently explained:

---

**3.** The DOT Report is an official public record and report pursuant to Fed.R.Evid. 803(8).

**4.** Instead, the FRA found it sufficient merely to continue "safety initiatives" in those areas. *Id.*

Summary judgment is proper in cases in which there is no genuine issue of material fact. Fed.R.Civ.P. 56(c).... [The court] must view all of the evidence in the light most favorable to the non-moving party. *Samples ex. rel. Samples v. Atlanta,* 846 F.2d 1328, 1330 (11th Cir.1988). The movant bears the initial burden of presenting evidence sufficient to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When the movant has met its burden, the non-movant must then designate, by affidavits, depositions, admissions, and answer to interrogatories, specific facts showing the existence of a genuine issue for trial. *Jeffery v. Sarasota White Sox, Inc.,* 64 F.3d 590, 593–94 (11th Cir.1995).

*Southern Solvents, Inc. v. New Hampshire Ins. Co.,* 91 F.3d 102, 104 (11th Cir.1996). Further,

An issue of fact is "genuine" if the record as a whole could lead a rational trier of fact to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue is "material" if it might affect the outcome of the case under the governing law. *Id.*

*Bennett v. United States,* 102 F.3d 486, 488 (11th Cir.1996).

**Train Speed**

■ 3. The claims against Amtrak concerning the speed of the Sunset Limited train are expressly pre-empted by federal regulations. *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993)[5]; 49 C.F.R. § 213.9(a); 49 C.F.R. § 236.0(d); *see also Thirkill v. J.B. Hunt Transp., Inc.,* 950 F.Supp. 1105, 1107 (N.D.Ala.1996); *National R.R. Passenger Corp. v. H & P, Inc.,* 949 F.Supp. 1556, 1561 (M.D.Ala.1996); *Woods v. Amtrak,* 982 F.Supp. 409, 411 (N.D.Miss. 1997).[6]

■ 4. Moreover, the claims against Amtrak concerning the speed of the Sun-

---

5. In *Easterwood,* the United States Supreme Court held that federal railroad-safety regulations preempt state common-law negligence claims based on the alleged excessive speed of a train. In that case, a driver of a truck was killed in a collision with a train at a grade crossing in Georgia. The driver's estate filed a wrongful death action against CSX alleging, among other things, that CSX negligently operated the train at an excessive speed. The track at the grade crossing was a Class 4 track for which the maximum authorized speed pursuant to 49 C.F.R. § 213.9(a) for a freight train is 60 miles per hour. As the train was traveling at a speed less than 60 miles per hour at the time of the accident, the Supreme Court held that plaintiff's excessive speed claims were preempted by federal railroad-safety regulations, and therefore, should be dismissed as a matter of law. The Supreme Court reasoned that the speed limit regulations of 49 C.F.R. § 213.9(a) are to be understood as covering the subject matter of train speed with respect to track conditions, including the conditions posed by grade crossings, and to be read as not only establishing a ceiling, but also precluding additional state law claims and regulations. *See also, Hester v. CSX Transportation, Inc.,* 61 F.3d 382, 384 n. 2 (5th Cir.1995); and *Gibson v. Norfolk Southern Corp.,* 878 F.Supp. 1455, 1463 (N.D.Ala.1994).

In this case, the Amtrak passenger train was traveling at less than 80 mph at the time the Casualty occurred. As previously noted, the track was a Class 4 track on which passenger trains are authorized by federal regulations to travel at a speed of 80 miles per hour. Consequently, the regulations issued by the Secretary of Transportation and contained in the Code of Federal Regulations preempt the plaintiffs' excessive speed claims.

6. This court has previously held that federal regulations preempt state law claims based on excessive speed in an unpublished ruling issued in an unrelated case. *Herman M. Gandy, Jr. v. CSX Transp., Inc.,* Civil Action No. 1:97–0809–RV–M (August 28, 1998).

set Limited train present technical issues beyond the common experience and understanding of the average jury. Because the train speed claims are not supported by expert testimony, WGN and the PSC cannot establish a *prima facie* case on those claims even if the claims were not preempted. *See, e.g., Townsend v. General Motors Corp.*, 642 So.2d 411, 415–18 (Ala.1994); *Brooks v. Colonial Chevrolet–Buick, Inc.*, 579 So.2d 1328, 1333–34 (Ala. 1991); *Makuc v. American Honda Motor Co.*, 835 F.2d 389, 392 (1st Cir.1987); *accord Hall v. Kansas City S. Ry. Co.*, 1996 WL 671588, at *5–6 (N.D.Miss. Aug. 28, 1996); *H & P, Inc.*, 949 F.Supp. at 1559; *cf. Hasenfus v. Secord*, 962 F.2d 1556, 1559–61 (11th Cir.1992), *cert. denied*, 506 U.S. 1051, 113 S.Ct. 972, 122 L.Ed.2d 127 (1993); *Bernard v. Cessna Aircraft Corp.*, 614 F.2d 1075, 1078 (5th Cir.1980).

**Train Cars and Locomotives**

■ 5. The claims against Amtrak concerning the Sunset Limited locomotives are preempted by the Locomotive Boiler Inspection Act, 45 U.S.C. § 22 *et seq.* (now codified at 49 U.S.C. § 20701 *et seq.*). *See Napier v. Atlantic Coastline R.R.*, 272 U.S. 605, 613, 47 S.Ct. 207, 210, 71 L.Ed. 432 (1926); *Thirkill*, 950 F.Supp. at 1108; *Springston v. Consol. Rail Corp.*, 130 F.3d 241, 244–45 (6th Cir.1997), *cert. denied*, 523 U.S. 1094, 118 S.Ct. 1560, 140 L.Ed.2d 792 (1998); *Law v. General Motors Corp.*, 114 F.3d 908, 910–13 (9th Cir. 1997).

■ 6. The claims against Amtrak concerning the Sunset Limited passenger car emergency exits are expressly pre-empted by federal regulations. *See* 49 C.F.R. §§ 223.9(c), 223.15(c); *cf. Easterwood*, 507 U.S. at 664, 113 S.Ct. 1732; *Toadvine v. Norfolk S. Ry. Co.*, 1997 WL 720431, at *1–2, 4–7 (6th Cir. Nov. 13, 1997); *Roland v. Olin Corp.*, 1996 WL 943902, at *7–10 (E.D.Mich. Oct. 23, 1996).

■ 7. The remaining claims against Amtrak concerning other features of the Sunset Limited passenger cars are pre-empted under the doctrine of "negative pre-emption." *See, e.g.*, Exh. H, DOT Report; *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 178, 98 S.Ct. 988, 1004–05, 55 L.Ed.2d 179 (1978); *Burlington Northern and Santa Fe R.R. v. Doyle*, 186 F.3d 790, 1999 WL 528476 *10 (7th Cir. July 23, 1999); *Norfolk & W. Ry. v. Public Util. Comm'n*, 926 F.2d 567, 572 (6th Cir.1991).

■ 8. The claims against Amtrak concerning the Sunset Limited cars and locomotives, which purport to state a cause of action for "crashworthiness," are insufficient as a matter of law. There is no cause of action against a railroad common carrier for the "crashworthiness" of the cars and locomotives on its train. *See, e.g., Anderson v. National R.R. Passenger Corp.*, 1996 WL 13823, at *5–7 (4th Cir. Jan. 16, 1996); *Blizzard v. National R.R. Passenger Corp.*, 831 F.Supp. 544 (E.D.Va. 1993).

■ 9. Moreover, the claims against Amtrak concerning the Sunset Limited cars and locomotives present technical issues beyond the common understanding and experience of the average juror. Because the claims are unsupported by expert testimony, WGN and the PSC cannot establish a *prima facie* case to support the claims even if these claims were not preempted. *See, e.g., McPhail v. Mitsubishi Motor Mfg. of Am., Inc.*, 80 F.Supp.2d 1309, 1309, 1314–18 (S.D.Ala.1997) (Vollmer, J.) *aff'd without op.*, 141 F.3d 1190 (11th Cir.1998), *cert. denied*, 525 U.S. 1068, 119 S.Ct. 796, 142 L.Ed.2d 658 (1999); *Woods v. Jones*, 1996 U.S. Dist. LEXIS 12725, at *4–6 (S.D.Ala. Aug. 27, 1996) (Hand, J.); *Thirkill*, 950 F.Supp. at 1107; *Townsend*, 642 So.2d at 415–18; *Holland v. Evenflo Corp.*, 1995 WL 49304, at *7 (9th Cir. Feb. 7, 1995); *Lowery v. General Motors Corp.*, 1994 WL 89328, *2–3 (4th

Cir. Mar. 21, 1994); *Makuc,* 835 F.2d at 392; *Curtis v. General Motors Corp.,* 649 F.2d 808, 813 (10th Cir.1981); *Humphreys v. General Motors Corp.,* 839 F.Supp. 822, 826–27 (N.D.Fla.1993), *aff'd without op.,* 47 F.3d 430 (11th Cir.1995); *accord Hasenfus,* 962 F.2d at 1561.

**Bayou Canot Railway**

10. The PSC and WGN assert that Amtrak breached its non-delegable duty as a common carrier for deficiencies in the track and bridge. *See* PSC Supp. Brief at 1 (asserting "non-delegable duty" with respect to "CSX-owned bridge at Bayou Canot"); WGN Supp. Brief at 1 (asserting "non-delegable duty" concerning "condition of the track and bridge over Big Bayou Canot").

11. Undisputedly, the Bayou Canot railway was owned and operated by CSXT at the time of the Casualty, and Amtrak has *never* owned or operated that railway. It is also undisputed that CSXT has never delegated out—to Amtrak or to any other railroad—CSXT's operation (including inspection, maintenance, *etc.*) of the railway.[7]

■ 12. None of the cases cited by the PSC and WGN[8] imposes on a carrier a duty (non-delegable or otherwise) to ensure the safety of a route it neither owns nor operates. Indeed, an attempt (similar to the PSC/WGN attempt here) to impose

such a duty was expressly rejected by the court in *National R.R. Passenger Corp. v. H & P, Inc.,* 949 F.Supp. 1556, 1565–66 (M.D.Ala.1996) (rejecting argument that Amtrak could be held responsible for the condition of the CSXT railway).[9] Indeed, no court has held that a common carrier has a duty to ensure the safety of the route—roadway, runway, or railway—over which it runs (but does not own or operate). Any claims against Amtrak that attempt to impose such a duty concerning the CSX-owned and operated railway at Bayou Canot are legally insufficient. *See H & P, Inc.,* 949 F.Supp. at 1566–67.

**FELA**

13. The PSC's assertion that "the Amtrak employees' FELA (the Federal Employers' Liability Act, 45 U.S.C. § 51 *et seq.*) claims are not pre-empted by other federal acts involving railway issues," (PSC Supp. Brief at 4), is without a legal foundation.

14. The FELA claims by the railroad employees, like the general maritime claims by the passengers, are negligence based. *See* FELA, 45 U.S.C. § 51 (action against railroad employer "due to its negligence").[10] FELA is not a strict liability statute, and it "does not make the [railroad] employer the insurer of the safety of his employees while they are on duty."

---

7. Amtrak and CSXT assert that the claims against CSXT concerning the railway are pre-empted. *See* CSXT's motion for summary judgment. Because the court concludes that Amtrak owed no one a duty with respect to the bridge and the track, the court does not reach the pre-emption issue.

8. This issue is govern by maritime law. *See In re Amtrak "Sunset Limited" Train Crash in Bayou Canot,* 121 F.3d 1421, 1426–27 (11th Cir.1997), *cert. denied,* 522 U.S. 1110, 118 S.Ct. 1041, 140 L.Ed.2d 106 (1998).

9. *Accord Seaboard Sys. R.R. v. Coffee,* 565 So.2d 35, 37–38 (Ala.) (FELA case) (refusing

to hold railroad employer liable for negligence of third-party track owner), *cert. denied,* 498 U.S. 898, 111 S.Ct. 253, 112 L.Ed.2d 211 (1990).

10. The PSC concedes that FELA claims are negligence based, but asserts that FELA imposes liability for "slight negligence." Amtrak argues that the standard of care is ordinary prudence under the circumstances. Given the court's determination that plaintiffs' FELA claims fail due to pre-emption, lack of duty, and/or lack of expert testimony, the court does not reach the issue of the degree of negligence required under FELA.

*Ellis v. Union Pac. R.R.*, 329 U.S. 649, 653, 67 S.Ct. 598, 91 L.Ed. 572 (1947); *accord Seaboard Air Line Ry. v. Horton*, 233 U.S. 492, 501–02, 34 S.Ct. 635, 58 L.Ed. 1062 (1914) (railroad employer is not a guarantor of the safety of the work place); *Carlew v. Burlington N. R.R.*, 514 So.2d 899, 901 (Ala.1987) (same); *see also Seaboard Sys. R.R. v. Coffee*, 565 So.2d 35, 37–38 (Ala.) (refusing to hold railroad employer liable for negligence of third-party track owner), *cert. denied*, 498 U.S. 898, 111 S.Ct. 253, 112 L.Ed.2d 211 (1990).

■ 15. Like common law negligence claims, FELA negligence claims may not be used to impose duties beyond those imposed by Congress or the FRA—that is, FELA claims may, indeed, be subject to pre-emption.[11] *See, e.g., Thirkill v. J.B. Hunt Transp., Inc.*, 950 F.Supp. 1105, 1107–08 (N.D.Ala.1996) (where train speed and locomotive design complied with federal regulations, railroad employee's FELA claims were pre-empted); *Rice v. Cincinnati, New Orleans & Pac. Ry.*, 955 F.Supp. 739, 740–41 (E.D.Ky.1997) (same); *Key v. Norfolk So. Ry.*, 228 Ga.App. 305, 491 S.E.2d 511, 513 (1997) (FELA claims of negligence as to locomotive design were pre-empted where locomotive complied with federal statute and regulations).[12]

■ 16. Moreover, FELA claims, like common law negligence claims, must be supported by expert testimony where they involve issues (such as train speed and railcar design) beyond the common experience and understanding of the average jury. *See, e.g., Thirkill*, 950 F.Supp. at 1107 (FELA claims attacking locomotive design and train speed subject to summary judgment where they lacked expert support); *see also Simpson v. Northeast Ill. Reg'l Commuter R.R.*, 957 F.Supp. 136, 138–39 (N.D.Ill.1997) (summary judgment for railroad where FELA plaintiff proffered no expert testimony to support his claim). As noted above, plaintiffs have offered no such expert testimony to establish these claims.

17. In short, as with all of the other claims against Amtrak in this MDL, the FELA claims are subject to summary judgment due to pre-emption, lack of a duty, and/or lack of expert testimony.

## CONCLUSION

18. The brevity of this ruling is in sharp contrast to the amount of careful consideration given by the court to the issues decided herein. Indeed, the court withheld ruling on Amtrak's motion for summary judgment until it was fully satis-

---

11. The PSC's position that FELA claims cannot be pre-empted would result in this oddity: The negligence claim of an Amtrak crew member concerning, *e.g.*, train speed or the design of one of the train cars could escape pre-emption, while the same negligence claim by an Amtrak passenger who was traveling on the same train and even in the same car would be pre-empted. The law does not countenance that incongruous result. *See, e.g., Rice*, 955 F.Supp. at 740 (where Federal Railway Safety Act ("FRSA") and FELA are inconsistent, "the FRSA will supersede the FELA based on the policy embodied in the FRSA *to ensure uniformity in law pertaining to railway safety* ") (emphasis added).

12. The cases cited by the PSC are not to the contrary. They are simply examples of situa-

tions where FELA claims were not pre-empted. None of the claims or pre-emption arguments were similar to the claims here. For example, most of the PSC's cases concern whether the Railway Labor Act's requirement of arbitration of some labor disputes pre-empts FELA negligence claims. Others simply demonstrate the interaction between FELA and claims for violations of federal statutes. The cases carry no across-the-board prohibition on pre-emption of FELA negligence claims, because there is no such prohibition. (And, as noted in the preceding footnote, such a prohibition would be contrary to the policy of uniformity in the law pertaining to railway safety.)

fied of the correctness of the legal conclusions herein. This ruling was preceded by exhaustive discovery on all possible liability bases (prosecuted by the "top shelf" attorneys on the PSC and defended by equally skilled counsel for all of the defendants), extensive briefing, and two oral arguments. The events giving rise to this Multi–District Litigation (succinctly termed "the Casualty" herein) are, without question, tragic, and the reverberations from that 10 minute interval between the allision and the derailment are still being felt more than six years later. Nevertheless, having scrutinized the record and the applicable law, the court can find no act or omission on the part of Amtrak which breached any of the legal duties it owed to its passengers and employees. Quite simply, Amtrak did nothing wrong.

19. For the foregoing reasons, defendant Amtrak is entitled to summary judgment on all of the claims asserted by all of the parties in these actions. However, judgment will not be entered until all of the remaining claims in these actions are resolved, either through trial or settlement.