**Vito TUFARIELLO, Plaintiff,**

v.

**LONG ISLAND RAIL ROAD COMPANY, Defendant.**

**No. 03 CV 3520(CLP).**

United States District Court,
E.D. New York.

March 18, 2005.

Philip Patrick Vogt, Altier & Vogt, LLC, New York, NY, for Vito Tufariello, Plaintiff.

Sean Patrick Constable, Long Island Rail Road, Law Department, Jamaica, NY, for Long Island Rail Road Company, Defendant.

## MEMORANDUM AND ORDER

POLLAK, United States Magistrate Judge.

On July 18, 2003, plaintiff Vito Tufariello commenced this personal injury action against his former employer, the Long Island Rail Road Company ("LIRR"), pursuant to the Federal Employers' Liability Act, 45 U.S.C. § 51, *et seq.* ("FELA"), based on plaintiff's alleged exposure to extremely loud locomotive horns and his subsequent loss of hearing. By Notice of Motion, dated January 24, 2005, the LIRR moves for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, on two grounds: (1) plaintiff's claims are preempted by the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. §§ 20101–20153 (formerly 45 U.S.C. §§ 421–447), and regulations promulgated thereunder; and (2) plaintiff cannot establish a *prima facie* case of negligence. The LIRR also moves, under Rules 104 and 702 of the Federal Rules of Evidence, to preclude plaintiff's expert from testifying

based on defendant's claim that the expert's opinions lack reliability.

Based on a review of the parties' arguments, this Court grants defendant's motion for summary judgment.

### FACTUAL BACKGROUND

Plaintiff, a former employee of the LIRR who retired in September 2003, was assigned to work in the LIRR's Patchogue Yard from 1998 through 1999 where he built parts for an ongoing bridge project. (Def's 56.1 Stmnt ¶¶ 1, 5).[1] The Patchogue Yard is located west of the Patchogue Station, south of the railroad tracks. (*Id.* ¶ 6). During this same period of time, the LIRR placed into service its new DE and DM locomotives, which were equipped with audible warning horns. (*Id.* ¶¶ 7–8). These horns would sound for ten to fifteen seconds each time the locomotives entered and exited the Patchogue Station and proceeded through the street crossings that are located on the east and west ends of the Patchogue Yard. (*Id.* ¶¶ 6, 8, 20). Defendant estimates that between six and twelve locomotives passed through the yard during the working day. (*Id.* ¶ 19).

Plaintiff alleges that the "horn blasts were so loud that a person's speech could not be heard by another person within one arm's length when spoken at normal levels in the Yard." (Pl's. 56.1 Stmnt ¶ 34).[2] Plaintiff further asserts that the horn blasts were "universally perceived by human beings to be excessively shockingly loud." (*Id.* ¶ 29). According to plaintiff, these horn blasts were so loud that plaintiff's ears would continue to ring even after the blast had ended. (*Id.* ¶ 35).

Defendant concedes that it received complaints not only from LIRR employees but also from members of the community about the noise levels of the new horns. (Def's. 56.1 Stmnt ¶ 9). In response, the LIRR conducted tests in May and June 1999 to determine if the new warning horns were in compliance with regulations promulgated by the Federal Railroad Administration ("FRA regulations"). (*Id.* ¶¶ 10–12). *See* 49 C.F.R. § 229.129. Although tests were conducted in the Richmond Hill and Morris Park Yards, defendant concedes that no testing was conducted at the Patchogue Yard. (*Id.* ¶ 13).

Defendant contends that the "[t]esting revealed that the new DE and DM locomotive audible warning horns were on par with the existing diesel equipment and louder than electric equipment." (*Id.* ¶ 14). Defendant asserts that in 1998 and 1999, FRA regulations required these horns to produce a minimum sound level of 96 decibels ("dB(A)"), measured from 100 feet forward of the locomotive and four feet above the center line of track. (*Id.* ¶ 11). *See* 49 C.F.R. § 229.129. Defendant contends that, based on its testing, the highest sound level of the new horns, when measured 100 feet forward of the locomotive, was 100 dB(A). (*Id.* ¶ 17). When measured 90 degrees perpendicular to the track and 30 feet from the locomotive, the new horns registered 110 dB(A). (*Id.*)

Plaintiff asserts that the LIRR's testing demonstrated that the DE 30 horns "were [a] 'more annoying sound and/or loudness [ ]' due to [the] control of the horn, duration, shrillness of the horns and location of the horn on the locomotive 40 feet from the front." (Pl's. 56.1 Stmnt ¶ 14). The testing also showed that the horns were directed over the adjacent trees and shrubs which would normally absorb the

---

**1.** Citations to "Def's. 56.1 Stmnt" refer to Defendant's Local Rule 56.1 Statement, dated January 24, 2005.

**2.** Citations to "Pl's. 56.1 Stmnt" refer to Plaintiff's Local Rule 56.1 Statement in Opposition to Defendant's Motion, dated February 18, 2005.

sound. (*Id.*) Thus, according to plaintiff, there was a clear difference between the old and the new locomotive warning horns. (*Id.*) With respect to the federal regulations, plaintiff contends that these regulations only set minimum levels measured at certain locations; there are no other FRA rules or regulations which deal with sound levels.[3] (*Id.* ¶ 10). Thus, plaintiff asserts that the other tests performed by the LIRR were not in accordance with the FRA. (*Id.* ¶ 12).

As a result of the testing, the LIRR reduced the frequency or pitch of the horns and repositioned the horns on the locomotives. (Def's. 56.1 Stmnt ¶ 15). According to plaintiff, the LIRR also changed the method for controlling the horn to eliminate a delay between the engineer's action and the horn sounding. (Pl's. 56.1 Stmnt ¶ 15). Plaintiff asserts, however, that the LIRR ignored complaints about these new horns for more than a year and that the modifications were made only after Governor Pataki intervened. (Pl's. 56.1 Stmnt ¶¶ 30, 32). After the modifications were made, testing showed that the highest level measured from 100 feet forward of the locomotive was 108 dB(A); the highest level when measured 90 degrees perpendicular and 30 feet from the locomotive was 111 dB(A).[4] (Def's. 56.1 Stmnt ¶ 18).

Plaintiff claims that in September 2000, he first noticed a problem with his hearing. He further alleges that two years earlier, on September 4, 1998, he was tested by the LIRR Medical Department and found

to have normal hearing. (Pl's. 56.1 Stmnt ¶ 38). He claims that he suffered a loss of hearing as a result of the noise levels to which he was exposed while working at the Patchogue Yard. (*Id.* ¶¶ 27, 37).

## DISCUSSION

Defendant LIRR moves for summary judgment on the grounds that plaintiff's FELA claim is preempted by the Federal Railroad Safety Act, 49 U.S. §§ 20101–20153, and that, in any event, plaintiff has failed to demonstrate a *prima facie* case of negligence.

### A. *Summary Judgment Standards*

■ It is well-settled that a party moving for summary judgment has the burden of establishing that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990). Since summary judgment is an extreme remedy, cutting off the rights of the non-moving party to present a case to the jury, *see Egelston v. State Univ. College at Geneseo*, 535 F.2d 752, 754 (2d Cir.1976); *Gibralter v. City of New York*, 612 F.Supp. 125, 133–34 (E.D.N.Y.1985), the court should not grant summary judgment unless it is clear that all of the elements have been satisfied. *See Auletta v. Tully*, 576 F.Supp. 191, 194–95 (N.D.N.Y.1983), *aff'd*, 732 F.2d 142 (2d Cir.1984). In addition,

---

**3.** As of April 1, 2005, new federal regulations for audible warning devices become effective, including an amendment to 49 C.F.R. § 229.129 which sets a maximum sound level for such devices. *See* discussion *infra* at 12, n. 9.

**4.** During the October 1999 testing, the LIRR also tested the noise levels of the audible warning device in the interior of the locomo-

tive cab. The highest level when measured at the approximate location of the engineer's left ear was 101 dB(A) with the windows closed. The LIRR concluded that "[t]his level is acceptable as the short interval would not greatly affect the time-weighted average for an engineer's 8–hour day . . . ." (Declaration of Sean Constable, Esq., dated Jan. 24, 2005 ("Constable Decl."), Ex. F).

" 'the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion.' " *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).

■ Once the moving party discharges its burden of proof under Rule 56(c), the party opposing summary judgment "has the burden of coming forward with 'specific facts showing that there is a genuine issue for trial.' " *Phillips v. Kidder, Peabody & Co.,* 782 F.Supp. 854, 858 (S.D.N.Y. 1991) (quoting Fed.R.Civ.P. 56(e)). Rule 56(e) "provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 256, 106 S.Ct. 2505. A party opposing summary judgment may not "merely...assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.,* 77 F.3d 603, 615 (2d Cir.1996) (internal quotations omitted). The party must set forth "concrete particulars" showing that a trial is necessary. *Nat'l Union Fire Ins. Co. v. Deloach,* 708 F.Supp. 1371, 1379 (S.D.N.Y. 1989). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 247–48, 106 S.Ct. 2505 (emphasis in original).

In reversing a grant of summary judgment, the Second Circuit noted that the " '[t]rial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.' " *Quaratino v. Tiffany & Co.,* 71 F.3d 58, 65 (2d Cir.1995) (quoting *Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1224 (2d Cir.1994)).

**B. Preemption**

Plaintiff, an injured railroad employee, brings this action under FELA, which provides the exclusive remedy for plaintiff in this case. 45 U.S.C. §§ 51, *et seq. See Rivera v. Union Pacific Railroad Co.,* 378 F.3d 502, 507 (5th Cir.2004); *see also Lane v. R.A. Sims, Jr., Inc.,* 241 F.3d 439, 442 (5th Cir.2001); *Dixon v. CSX Transp., Inc.,* 990 F.2d 1440, 1442 n. 2 (4th Cir. 1993); *Rice v. Cincinnati, New Orleans & Pacific Ry. Co.,* 955 F.Supp. 739, 740 (E.D.Ky.1997). FELA provides a cause of action to a railroad employee for injury resulting "from the negligence of [the railroad] ... or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works ... or other equipment." 45 U.S.C. § 51.

The Federal Railway Safety Act, which was enacted some 62 years after FELA, has as its stated purpose, to "promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. Pursuant to the FRSA, the Secretary of Transportation is directed to "prescribe regulations and issue orders for every area of railroad safety supplementing laws and regulations in effect on October 16, 1970." 49 U.S.C. § 20103; *see also CSX Transpor., Inc. v. Easterwood,* 507 U.S. 658, 662, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993) (holding that the FRSA of 1970, 45 U.S.C. § 431(a), gave the Secretary of Transportation broad powers to study and develop "as necessary, appropriate rules, regulations, orders, and standards for all areas of railroad safety"). The FRSA contains a specific preemption provision which allows a State to "adopt or continue in force a law,

regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement." 49 U.S.C. § 20106. The statute explicitly states: "Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable." *Id.* A state may adopt more stringent regulations, only if the state law is (1) "necessary to eliminate or reduce an essentially local safety hazard," (2) is not "incompatible" with any federal laws, and (3) "does not unreasonably burden interstate commerce." *Id.*

Although the express preemption clause in the FRSA speaks in terms of preemption of state law, and the plaintiff's action here is brought pursuant to FELA, a federal law, at least one court has held that in reconciling the two federal statutes, "the FRSA will supersede the FELA based on the policy embodied in the FRSA to ensure uniformity in law relating to railway safety." *Rice v. Cincinnati, New Orleans & Pacific Ry. Co.*, 955 F.Supp. at 740 (citing 49 U.S.C. § 20106); *accord Waymire v. Norfolk & Western Ry. Co.*, 218 F.3d 773, 776–777 (7th Cir.2000) (holding that "in order to uphold [the] FRSA's goal of uniformity," the FRSA supercedes FELA where the train's speed and warning devices complied with the FRSA); *Thirkill v. J.B. Hunt Transp., Inc.*, 950 F.Supp. 1105, 1107–08 (N.D.Ala.1996) (holding that where train speed and locomotive design complied with federal regulations, railroad employee's FELA claims were preempted by the FRSA since "Congress has established a policy of national uniformity of laws, rules, regulations, orders and standards") (citing 49 U.S.C. § 20106). Other courts have rejected the argument that FELA is not preempted by the FRSA, based on the analysis that FELA is a negligence based statute and "[l]ike common law negligence claims, FELA negligence claims may not be used

to impose duties beyond those imposed by Congress or the FRA— that is, FELA claims may, indeed, be subject to preemption." *In re Amtrak "Sunset Ltd." Train Crash,* 188 F.Supp.2d 1341, 1349 (S.D.Ala. 1999) (citing *Thirkill v. J.B. Hunt Transp., Inc.,* 950 F.Supp. at 1107–08); *accord Rice v. Cincinnati New Orleans & Pac. Ry.,* 955 F.Supp. at 740–41;) *see also CSX Transp., Inc. v. Easterwood,* 507 U.S. at 664, 113 S.Ct. 1732 (holding that "[l]egal duties imposed on railroads by the common law fall within the scope of these broad phrases").

■ Thus, the question to be determined is whether there are regulations issued by the Secretary of Transportation dealing with the warning horns that " 'cover' " or " 'substantially subsume' " the issues raised by plaintiff's FELA claims here. *Norfolk Southern Ry. Co. v. Shanklin,* 529 U.S. 344, 352, 120 S.Ct. 1467, 146 L.Ed.2d 374 (2000) (quoting *CSX Transp., Inc. v. Easterwood,* 507 U.S. at 664–665, 113 S.Ct. 1732) (noting that the term "cover" requires more than just a showing that the regulations " 'touch upon' or 'related to' " to the subject matter); *see also Major v. CSX Transp.,* 278 F.Supp.2d 597, 608–10 (D.Md.2003) (holding that when the federal government applies its regulations and requirements to signal systems through inspection and testing, the result is preemption by the FRSA of the FELA claims based on the design and operation of those signal systems).

There are specific federal regulations promulgated pursuant to the FRSA, by the Secretary of Transportation acting through the FRA, which relate to audible warning devices that are codified in 49 C.F.R. § 229.129. Subsection (a) of the regulation sets a minimum sound level for audible warning devices. The statute provides as follows:

(a) After August 31, 1980, each lead locomotive shall be provided with an audible warning device that produces a minimum sound level of 96dB(A) at 100 feet forward of the locomotive in its direction of travel. The device shall be arranged so that it can be conveniently operated from the engineer's normal position in the cab.

49 C.F.R. § 229.129(a). The regulation further defines how the sound levels of audible warning devices shall be measured.

(b) Measurement of the sound level shall be made using a sound level meter conforming, at a minimum, to the requirements of ANSI S1.4–1971, Type 2, and set to an A-weighted slow response. While the locomotive is on level tangent track, the microphone shall be positioned 4 feet above the ground at the center line of the track, and shall be oriented with respect to the sound source in accordance with the manufacturer's recommendations.

(c) A 4dB(A) measurement tolerance is allowable for a given measurement.[5]

49 C.F.R. § 229.129(b), (c).

Defendant LIRR contends that its testing of the audible warning devices on the DE and DM locomotives demonstrated that they were in compliance with this federally mandated minimum sound level.[6] Even though the devices were not tested at the Patchogue Yard, defendant asserts that plaintiff has not presented any evidence to show what the levels were at that location or that the levels at the Patchogue Yard were inconsistent with the levels recorded at the other yards.

Defendant further argues that because the sound levels are set by the FRSA regulations, plaintiff's claims of common law negligence are preempted. Defendant argues that to allow juries on a case by case basis to determine what is a reasonable level of sound for these devices would result in inconsistent decisions and "thwart Congress' intent to ensure uniformity in railroad safety." (Def's. Mem. at 7) (citing *Lane v. CSX Transp., Inc.*, 241 F.3d at 443–44; *Rice v. Cincinnati New Orleans & Pacific Ry. Co.*, 955 F.Supp. at 740).

In *CSX Transp., Inc. v. Easterwood,* the Supreme Court considered the issue of preemption in the context of a claim that the defendant railroad was negligent under a Georgia statute dealing with train speeds.[7] 507 U.S. at 664–65, 665 n. 5, 113 S.Ct. 1732. The Court held that the FRSA regulations governing the maximum train speeds for various classes of railroad tracks were "adopted only after the hazards posed by track conditions were taken into account." *Id.* at 674, 113 S.Ct. 1732. As a consequence, the Court held that under the preemption provision of the FRSA, states were precluded from enacting additional regulations which set the maximum speed at a lower level than that set by the FRSA. *Id.* Numerous decisions following *Easterwood,* including claims brought by railroad employees under FELA alleging negligence in unsafe train speed, found such claims to be preempted

---

**5.** Given the 4dB(A) variance in sound levels, an audible warning device may measure at 92dB(A) or 100dB(A) and still be in compliance with the FRA minimum.

**6.** If, as defendant claims, its tests demonstrated that the horns at issue here, measured in accordance with 49 C.F.R. § 229.129(b), produced a sound level of 100 dB(A), this is within the 4 dB(A) variance specified in the

regulation and would be presumptively proper under the regulations then in existence.

**7.** The Court also considered a claim based on the absence of proper warning devices at highway-rail grade crossings and held that the FRSA did not preempt that claim. *See CSX Transp., Inc. v. Easterwood,* 507 U.S. at 665–73, 113 S.Ct. 1732.

by the FRSA. *See, e.g., Waymire v. Norfolk & Western Ry. Co.,* 218 F.3d 773 (7th Cir.2000); *In re Amtrak "Sunset Ltd ." Train Crash,* 188 F.Supp.2d at 1346; *Thirkill v. J.B. Hunt Transp., Inc.,* 950 F.Supp. at 1107; *Earwood v. Norfolk Southern Ry. Co.,* 845 F.Supp. 880, 887–88 (N.D.Ga.1993) (holding that excessive speed claims are preempted, but refusing to hold that *Easterwood* extends to "any state regulation affecting speed of trains in any manner").

Although no authority has been cited by either side analyzing the audible warning devices regulation, the principles governing preemption are similar. The regulation at issue clearly prescribes minimum decibel levels for trains which are designed to alert drivers and the public that the train is advancing through an intersection.[8] The fact that the regulation sets a minimum level but does not specify maximum levels does not alter the applicability of the preemption provision in the FRSA.[9] The regulation at issue, 49 C.F.R. § 229.129, clearly "covers" the subject matter of plaintiff's negligence claims since the regulation deals specifically with the "sound-producing capacity" of audible warning devices. *See Southern Pacific Transp. Co. v. Public Utility Comm. of Oregon,* 9 F.3d 807, 813 (9th Cir.1993) (holding that Section 229 regulates the "sound-producing capacity" of train whistles as distinguished from their "use"). In setting the minimum level, the FRA considered how loud an audible warning device must be in order to overcome any vehicle or ambient noise that might dampen or mute its effect, and was especially concerned about having audible warning devices that were loud enough to provide warnings at passively signed crossings. *See* Use of Locomotive Horns at Highway–Rail Grade Crossings, 68 Fed. Reg. at 70601–02. The FRA had also promulgated regulations concerning the appropriate levels of railroad noise emissions, 49 C.F.R. §§ 210 *et seq.,* but had specifically exempted "sound emitted by warning devices, such as horns, whistles, or bells when operated for the purpose of safety." 49 C.F.R. § 210.3(b)(3). *See also Burlington Northern Railroad Co. v. City of Connell,* 811 F.Supp. 1459, 1465 (E.D.Wash.

---

**8.** *See generally* Use of Locomotive Horns at Highway–Rail Grade Crossings, 68 Fed.Reg. 70586 (Dec. 18, 2003) (discussing the history of regulations dealing with audible warning devices and studies of the impact of the devices on train and vehicle collisions at highway-rail crossings).

**9.** The latest amendment to 49 C.F.R. § 229.129, which becomes effective April 1, 2005, now sets a maximum level for audible warning devices:

(a) Each lead locomotive shall be provided with an audible warning device that produces a minimum sound level of 96dB(A) and a maximum sound level of 110 dB(A) at 100 feet forward of the locomotive in its direction of travel. The device shall be arranged so that it can be conveniently operated from the engineer's usual position during operation of the locomotive.

49 C.F.R. § 229.129(a) (effective April 1, 2005). However, it is clear from the notes in the Federal Register, Use of Locomotive Horns at Highway–Rail Grade Crossings, 68 Fed.Reg. 70586 (Dec. 18, 2003), that the FRA had considered maximum levels in regards to employee safety prior to adopting this amendment. *See* discussion *infra* at 13. The new maximum levels, as well as the amended regulations concerning the testing of audible warning devices, and the use of horns at highway-rail grade crossings, were promulgated in response to community concerns about noise pollution and nuisance. *See* Use of Locomotive Horns at Highway–Rail Grade Crossings, 68 Fed.Reg. at 70586–87, 70594. The Court also notes that the maximum levels measured by the LIRR in its testing at the Richmond Hill and Morris Park Yards, *see* discussion *supra* at 3–4; *see also* Def's. 56.1 Stmnt ¶¶ 17, 18, would be in compliance with the maximum level set by the amended FRA regulations. *See* 49 C.F.R. § 229.129(a) (effective April 1, 2005).

1993) (citing 49 C.F.R. § 210.3(b)(3); *Norfolk Southern Ry. Co. v. Hapeville,* 779 F.Supp. 601, 604 (N.D.Ga.1991)). Thus, these regulations clearly "cover" or "substantially subsume" the issue raised here.

Moreover, although the current regulation setting a minimum sound level does not appear to be dealing with the safety of railroad employees, but rather with the safety of the general public, courts have held that one of the " 'significant motivations' " behind FRSA's enactment was " 'railroad employee safety.' " *Lane v. R.A. Sims. Jr., Inc.,* 241 F.3d at 444 (noting "[r]ailroad operations *cannot* be conducted *without* railroad employees; therefore, it seems obvious that railroad employee safety is one of the 'area[s] of railroad operations' addressed by the statute and regulations"). Indeed, it is clear from the history of the audible warning devices that both railroads and the FRA considered the impact of the sound levels on railroad employees. The FRA considered the acceptable amount of noise within the locomotive cab where an audible warning device would be located and would be loudest, and promulgated safety standards under 49 C.F.R. § 229.121. *See* 49 C.F.R. § 229.121; *see also* Use of Locomotive Horns at Highway–Rail Grade Crossings, 68 Fed.Reg. at 70609–10 (explaining that "FRA has a long history of working with the railroad industry to improve locomotive cab working conditions and has been sensitive in this rulemaking to balance the need to reduce noise exposure to operating crews with community noise concerns."). The FRA was also aware that railroads would relocate the horns to the center of the locomotive roof in order "to reduce crew occupational noise exposure." *See* Use of Locomotive Horns at Highway–Rail Grade Crossings, 68 Fed.Reg. at 70601. Finally, as is commented in the notes to the new regulation, accidents involving trains and automobiles not only pose a danger to the driver of the vehicle but to the crew members and passengers of the train as well. *Id.* at 70587 (noting that "[n]ationally, from 1994 to 1998, eight railroad crewmembers died in collisions at highway-rail crossings, and 570 crewmembers were injured"). For these reasons, it is clear that when the FRA set the minimum level in 49 C.F.R. § 229.129, it also considered the railroad employees' and community concerns about noise exposure and balanced those concerns with the safety rationale of audible warning devices.

Furthermore, like the speed regulations addressed in *Easterwood,* state statutes which promulgated maximum decibel levels could vary from state to state as could jury verdicts. defining maximum decibel levels. These varying rulings would undercut the Congressional goal of national uniformity. *See Thirkill v. J.B. Hunt Transp., Inc.,* 950 F.Supp. at 1107 (citing 49 U.S.C. § 20106, entitled "National uniformity of regulation" under which Congress promotes a policy of national uniformity of laws, rules, regulations, orders and standards relating to railroad safety); *see also Law v. General Motors Corp.,* 114 F.3d 908, 909–11 (9th Cir.1997) (holding that "[i]t has long been settled that Congress intended federal law to occupy the field of locomotive equipment and safety, particularly as it relates to injuries suffered by railroad workers in the course of their employment" and that "[t]his broad preemptive sweep is necessary to maintain uniformity of railroad operating standards across state lines"). More important, differing regulations or rules as to maximum decibel levels for these warning devices would result in "an undue burden on interstate commerce" as trains whose horns are set consistent with maximum allowable decibel levels in one state would be unable to travel to other states, or locales which had lower maximum decibel levels.

Accordingly, under the principles enunciated in the *Easterwood* decision, this Court holds that the FRSA regulations preempt plaintiff's FELA claim in this case.

## C. *OSHA Regulations*

■ Plaintiff does not directly address the argument that the FRSA preempts his FELA claims. Instead, he relies on certain regulations promulgated by the Occupational Safety and Health Administration ("OSHA"), which concern permissible levels of noise exposure. (Pl's. Mem. at 6 (citing 29 C.F.R. § 1910.95)). Plaintiff argues that 29 C.F.R. § 1910.95 does not contain a preemption clause, nor does it preclude employees from seeking relief from any injuries arising out of the course of their employment. (*Id.*)

These specific OSHA regulations were cited by defendant simply to establish that the LIRR's hearing loss conservation program, which was in effect in 1998 and 1999, mirrored the OSHA regulations requiring the employer to make available to employees certain hearing protection when their exposure to a time-weighted average of noise levels was 85dB(A) or greater. (Def's. Mem. at 3–5). The LIRR further asserts that its regulations are designed to ensure that hearing protection is worn by employees who are exposed to a time weighted average of 90dB(A) or greater or who are exposed to 8 hours of a time weighted average of 85dB(A) or greater. (*Id.*) The plaintiff has provided no evidence that he was part of the class of employees protected by this regulation or the levels of noise to which he was in fact exposed.

While plaintiff is correct that these OSHA regulations do not preempt his FELA claims, given the Court's finding that the FRSA preempts plaintiff's claims, the claims must be dismissed.

## D. *Prima Facie Case of Negligence*

■ The LIRR argues that even if plaintiff's claims were not preempted, plaintiff has failed to present any evidence to establish that the time weighted average of the horn levels to which plaintiff was exposed caused his loss of hearing.

Plaintiff has presented no objective measurements of the sound levels that he experienced at the Patchogue Yard, nor has he presented an expert witness who can address the question of whether the time weighted average of noise exposure to which plaintiff was exposed caused his loss of hearing. Instead, he relies on the subjective opinions of plaintiff and others that the horn blasts were "very, very loud" (Pl's. Mem. at 1), and his expert's opinion that "the connection between excessively loud noise and hearing loss has been medically accepted as fact for more than 200 years." (*Id.* at 7).

It is clear that the claims of excessive noise levels and the analysis of the OSHA regulations dealing with time weighted averages "present technical issues beyond the common experience and understanding of the average jury." *In re Amtrak "Sunset Ltd." Train Crash*, 188 F.Supp.2d at 1347. Although fellow employees with extensive experience in the Patchogue Yard may be able to offer testimony on their subjective impressions of the noise level of the DE and DM warning devices, they lack the technical expertise necessary to analyze whether the decibel levels of the horns were in fact higher than those of the older trains' horns or whether these horns caused plaintiff's loss of hearing. *See Thirkill v. J.B. Hunt Transp., Inc.* 950 F.Supp. at 1107 (holding that "[n]either the plaintiff nor fellow crewmen are qualified to testify as design experts").

While plaintiff's expert, Dr. Danziger, opines that plaintiff's loss of hearing was caused by exposure to the horn blasts

(Danziger Aff.[10] ¶ 19), he has not presented an analysis of the levels of noise exposure experienced by plaintiff, except to note that even noise found to be permissible under OSHA regulations might still cause injury. (*Id.* ¶ 16). The problem is that in the absence of any evidence as to the noise levels actually experienced by Mr. Tufariello, it is impossible for anyone to say that the railroad was negligent. Since plaintiff has presented no objective evidence to disprove defendant's asserted sound levels, those figures must be assumed to be true for purposes of this motion. If in fact, as the LIRR asserts, the sound levels of its horns were in compliance with both the FRSA minimum standard and with OSHA's regulations, the plaintiff will have a difficult, if not impossible, time establishing that the railroad was negligent. *See Lessee v. Union Pac. R.R. Co.*, 38 Wash. App. 802, 804–07, 690 P.2d 596, 598–600 (Wash.Ct.App.1984) (finding that where the time weighted average of noise exposure was below OSHA levels requiring protection, plaintiff had failed to demonstrate negligence); *see also Broussard v. Union Pac. R. Co.*, 700 So.2d 542, 550 (La.Ct.App.1997) (holding that "simply establishing that the workplace is noisy fails to meet the legal requirements for proving negligence").

In some cases where technical issues relating to railroad safety are concerned, courts have held that the failure to present expert testimony on those issues meant that the plaintiff had failed to establish a *prima facie* case. *See, e.g., In re Amtrak "Sunset Ltd." Train Crash*, 188 F.Supp.2d at 1347; *see also Simpson v. Northeast Illinois Regional Commuter Railroad Corp.*, 957 F.Supp. 136, 138 (N.D.Ill.1997) (holding that "expert testimony usually is

necessary to establish a causal connection between an injury and its source 'unless the connection is a kind that would be obvious to laymen, such as a broken leg from being struck by an automobile'"); *Turner v. Norfolk & Western Ry. Co.*, 785 S.W.2d 569, 572 (Mo.Ct.App.1990) (noting that "[t]he noise level which may produce hearing loss is not a matter of common knowledge, therefore [plaintiff] had the burden of proof to show that in the exercise of due care N & W should have known that the noise level ... could cause hearing loss .... While it may be said that it is a matter of common knowledge that loud noise may be harmful to hearing, it cannot be said that the dB(A) level which may cause injury to hearing is commonly known").[11]

In this case, in the absence of testimony either establishing the levels of noise exposure to which plaintiff was exposed or demonstrating that these levels can cause hearing loss, this Court finds that plaintiff has failed to establish a *prima facie* case of negligence.

Accordingly, because this Court finds that plaintiff's claims are preempted by the FRSA, and that plaintiff, even if allowed to pursue his claims, cannot establish a *prima facie* case, this Court grants defendant's motion for summary judgment.[12]

**SO ORDERED.**

---

**10.** Citations to "Danziger Aff." refer to the affidavit of Eliot Danziger, M.D., dated Feb. 16, 2005, Ex. B to the Declaration of Philip Vogt ("Vogt Decl."), submitted in opposition to defendant's motion for summary judgment.

**11.** The Court of Appeals of Missouri did not address the issue of preemption in *Turner v. Norfolk & Western Ry. Co.* because the parties did not raise the issue. *See generally* 785

S.W.2d at 569. However, this Court notes that most of the case law on the subject of preemption in the context of FRSA and FELA was decided after *Turner. See* discussion *supra* at 6–15.

**12.** Since the Court has granted defendant's motion for summary judgment, there is no reason to address defendant's motion to pre-

clude plaintiff's expert. Accordingly, this Court does not reach that issue.