**ANALECT LLC, Plaintiff and Counterclaim Defendant,**

v.

**FIFTH THIRD BANCORP, et al., Defendants and Counterclaim Plaintiffs.**

**No. 06–CV–891 (JFB)(WDW).**

United States District Court, E.D. New York.

Sept. 17, 2008.

Gregory A. Blue, Rachel K. Marcoccia of Morgenstern Fisher & Blue LLC, New York, NY, Thomas S. Biemer, Patrick M. Northern, Dilworth Paxson LLP, Philadelphia, PA, for Plaintiff and Counterclaim Defendant.

Adam L. Rosen, Alan E. Marder, Rosen Slome Marder LLP, Uniondale, NY, Daniel E. Izenson, Drew M. Hicks, Patrick F. Fischer, Keating Muething & Klekamp PLL, Cincinnati, OH, for Defendants and Counterclaim Plaintiffs.

## MEMORANDUM AND ORDER

JOSEPH F. BIANCO, District Judge:

Plaintiff Analect LLC ("Analect" or "plaintiff") brought the instant action for breach of contract[1] against defendants Fifth Third Bancorp (the "Bancorp") and Fifth Third Bank ("Fifth Third Bank (Michigan)") (collectively, "Fifth Third" or "defendants"), arising out of a letter agreement dated May 29, 2001 (the "contract"), relating to a financial product called SVSA BOLI. Defendants counterclaimed for declaratory judgment, largely relating to the validity of the contract.

Defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure both as to plaintiff's claims and defendants' counterclaims. For the reasons set forth below, defendants' motion is granted in part and denied in part. Specifically, although plaintiff's claim that the contract was breached simply by purchasing SVSA BOLI for an internal account cannot survive summary judgment, plaintiff's breach of contract claim based upon the alleged transmission and/or use of confidential information in connection with such purchase survives summary judgment and requires a trial. However, such claim survives summary judgment only as to Fifth Third Bank (Michigan), and not the Bancorp.

## I. FACTS

The Court has taken the facts described below from the parties' depositions, affidavits, exhibits, and respective Local Rule 56.1 statements of facts. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. See Capobianco v. City of New York, 422 F.3d 47, 50 (2d Cir.2005).

### A. The Parties

#### (1) Analect

Analect is a benefit finance company that helps clients design, coordinate, and implement unique financial solutions. (Defendants' Rule 56.1 Statement of Facts ("Defs.' 56.1") ¶ 1.)

##### a. The Financial Products at Issue

Plaintiff acts as a broker, agent, and/or consultant in the sale of financial products, including "business owned life insurance" ("BOLI") and "stable account business owned life insurance" ("SVSA BOLI"). (Defs.' 56.1 ¶ 1.) BOLI is a life insurance product that allows a company to purchase life insurance using the lives of its employees as insureds and to grow the cash value of the policy as an investment vehicle. (Defs.' 56.1 ¶ 2.) SVSA BOLI, on the other hand, is different from traditional BOLI in that SVSA BOLI contains a stable value feature that allows the owners of the policy to record the policy for financial statement purposes on an amortized book value basis. (Defs.' 56.1 ¶ 2.)

In particular, Analect created an SVSA BOLI in conjunction with Sun Life Financial ("Sun Life"), and contends that this product offers the most advanced features and pricing in the marketplace, including no service charge, explicit itemized pricing, detailed underlying portfolio which enables exact performance tracking, separate account structure which protects investment value in carrier liquidation, book value accounting treatment which eliminates statement volatility, and stabilized expense that results in smooth policy internal rate of return. (Defs.' 56.1 ¶ 5.) Analect further contends that it developed a unique structure to allow for the distribution of SVSA BOLI products to smaller banks without sufficient numbers of eligible proposed in-

---

1. Originally, Analect also brought a claim for unjust enrichment, but—as plaintiff con-firmed at oral argument—has withdrawn that claim. (See Pl.'s Mem. at 31 n. 21.)

sureds, in order to enable the small banks to obtain the same benefits of experience-rating that the large banks are able to enjoy. (Defs.' 56.1 ¶ 6.) Analect refers to this structure as the Multi–Grantor Trust Structure (the "MGT Structure"). (Defs.' 56.1 ¶ 6.) Analect contends that the MGT Structure allows nonaffiliated banks to pool their insured population into a large group that Sun Life will experience-rate, while at the same time each bank is able to maintain its own autonomy in terms of BOLI policy purchase. (Defs.' 56.1 ¶ 6.)

### (2) Fifth Third and Fifth Third Bank (Michigan)

The Bancorp is a bank holding company. (Defs.' 56.1 ¶ 7.) The Bancorp has officers, a board of directors, but no employees. (Defs.' 56.1 ¶ 7.) The Bancorp is the parent company of Fifth Third Financial Corporation, a wholly owned affiliate of the Bancorp. (Defs.' 56.1 ¶ 7.) Fifth Third Financial Corporation, in turn, is the parent company of several legal entities, including Fifth Third Bank (Michigan) and Fifth Third Bank (Ohio), which are wholly owned subsidiaries of Fifth Third Financial Corporation. (Defs.' 56.1 ¶ 7.) Fifth Third Bank (Chicago) is an affiliate of Fifth Third Bank (Michigan). (Defs.' 56.1 ¶ 8.) Fifth Third Bank (Ohio) is not a party to this action. (Defs.' 56.1 ¶ 7.)

### B. The Contract

In the Spring of 2001, Pat Horne, Fifth Third's correspondent bank manager located in Chicago, heard that one of his clients was thinking about purchasing BOLI. (Defs.' 56.1 ¶ 14.) Horne contacted Fifth Third's insurance group to see if it knew anything about BOLI. (Defs.' 56.1 ¶ 14.) Horne reached Charles Campbell in Fifth Third's insurance group. (Defs.' 56.1 ¶ 14.) Campbell, in turn, contacted Analect about developing a distribution relationship so that they could market an SVSA BOLI product to the Fifth Third correspondent bank client. (Defs.' 56.1 ¶ 15.)

Analect and Fifth Third commenced negotiations regarding this relationship and participated in a related meeting in Chicago in May 2001 (the "May 2001 meeting"). (*See* Defs.' 56.1 ¶¶ 23–36.)

On May 29, 2001, the parties executed the contract, which states, in relevant part:

Fifth Third Bank has requested certain information from Analect LLC, a Delaware limited liability company (the "Company"), in connection with our consideration of acting as a potential life insurance product distributer [sic] (a "Distributer" [sic] ), and possibly providing other services, in connection with the Company's distribution, either directly or indirectly though a subsidiary, of the Product (as defined below).

\* \* \*

The Information will not be used other than in connection with our acting as a Distributer [sic] for the Company. The information will be kept confidential by us and will not be disclosed by us to any person, other than to those of our Representatives (as defined below) who need to know the Information in connection with our acting as a Distributer [sic] for the Company. We will (i) inform each of our Representatives receiving Information of its confidential nature and of this letter agreement and its terms, (ii) cause our Representatives to . treat the Information confidentially in accordance herewith, and not to use it other than in connection with our acting as a Distributer [sic] for the Company, and otherwise to comply herewith as if parties hereto, (iii) be responsible for any disclosure or use of the Information by our Representatives ... contrary to the terms hereof ... and (iv) not, and will cause our Representatives not to, disclose to any

person that the Information exists or has been made available to us.

\* \* \*

(iii) no agreement for our acting as Distributer [sic], or providing any other services, shall be deemed to exist unless and until a definitive agreement is entered into by us and the company.

\* \* \*

We agree that, for so long as we retain or otherwise use any of the Information, and for a period of five years after we return or destroy all of the Information to you in the manner provided for in the preceding paragraph, except pursuant to a specific written request from the Company, neither we, nor any of our affiliates or Representatives, will (or will assist others to) develop, market, underwrite, distribute, coordinate the placement, administer or offer to any person, the Product or any product similar thereto without the prior written agreement of the Company.

\* \* \*

This letter agreement is binding on and shall inure to the benefit of the parties hereto and their respective successors and assigns.

\* \* \*

Money damages would not be a sufficient remedy for any violation of the terms of this letter agreement and, accordingly, the Company will be entitled to specific performance and injunctive relief as remedies for any violation, in addition to all other remedies available at law or equity.

\* \* \*

This letter agreement contains the entire agreement between us and the Company concerning the subject matter hereof.

(Pl.'s Exh. 18.) Further, the contract defines "Information" as

all information about the Company, any of its affiliates or the Product (whether written or oral or in electronic or other form and whether prepared by the Company, its advisers or otherwise) that is or has been furnished to us or any of our Representatives by or on behalf of the Company or any of its Representatives, together with all written or electronically stored documentation prepared by us or any of our Representatives based on or reflecting, in whole or in part, such information, *provided* that the term "Information" does not include any information that (x) is or becomes generally available to the public through no action or omission by us or any of our Representatives or (y) is or becomes available to us on a nonconfidential basis from a source, other than the Company or any of its Representatives, that to the best of our knowledge, after reasonable inquiry, is not prohibited from disclosing such information to us by a contractual, legal, fiduciary or other confidentiality obligation.

(Pl.'s Exh. 18.)

The contract states that it was executed by "Fifth Third Bank" and Analect, each of which had two signatories. (Pl.'s Exh. 18.) The signatories for "Fifth Third Bank" are Tom Roy, an officer with Fifth Third Insurance Services, Inc. and Gregory Beard, the Senior Vice President of Fifth Third (Chicago). (Pl.'s Exh. 18.) Clifford R. Eisler, the Co–Chairman and Co–CEO of Analect ("Eisler") and Frank T. O'Keefe, the other Co–Chairman and co–CEO of Analect ("O'Keefe") signed on behalf of plaintiff. (Pl.'s Exh. 18.)

C. Events Subsequent to Contract

After the contract was executed, Analect did not ultimately place BOLI policies with any Fifth Third clients. (Defs.' 56.1 ¶ 73.)

In late 2004, Fifth Third (Ohio) and Fifth Third (Michigan) purchased SVSA

BOLI for their own accounts (through Clark Consulting as the broker and Transamerica Life Insurance as the carrier) (the "2004 purchase"). (Defs.' 56.1 ¶ 111.)

## II. PROCEDURAL HISTORY

Plaintiff filed its original complaint in this action on March 1, 2006, its first amended complaint on June 30, 2006, and its second amended complaint (the "complaint") on March 2, 2007. On March 15, 2007, defendants filed their answer and counterclaims. On April 2, 2007, plaintiff filed an answer to defendants' counterclaims. On February 4, 2008, defendants filed the instant motion. On March 5, 2008, plaintiff filed its opposition. On March 17, 2008, defendants filed their reply. On May 6, 2008 and May 19, 2008, the parties submitted supplemental briefs. The Court held oral argument on August 21, 2008.

## III. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir.2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir.2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir.2004); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (noting that summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (internal citations omitted). Indeed, "the mere existence of some alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247–48, 106 S.Ct. 2505. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir.1984) (internal quotations omitted); *Tufariello v. Long Island R.R.*, 364 F.Supp.2d 252, 256 (E.D.N.Y. 2005). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir.1996) (internal quotations omitted). "[W]hen the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot be resolved on a motion for summary judgment." *Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir.2005).

## IV. BREACH OF CONTRACT CLAIM

In essence, Analect argues that defendants breached the contract in two ways. First, plaintiff argues that the contract not only barred defendants from acting as a distributor of SVSA BOLI on behalf of third parties, but also constituted an exclusivity agreement that barred defendants from purchasing SVSA BOLI for their own account from such third parties without Analect's written consent. Thus, Analect argues that the 2004 purchase, in itself, constituted a breach. Second, Analect argues that defendants breached the confidentiality provisions of the contract in the course of the 2004 purchase by utilizing and communicating "Information" in contravention of the contract's terms.

With respect to the first ground, as set forth below, the Court agrees with defendants that Analect's interpretation of the contract belies its plain and unambiguous meaning and that, as a matter of law, the contract did not preclude defendants from purchasing SVSA BOLI for their own account from a third party. However, with respect to the second ground, after carefully reviewing the record and drawing all reasonable inferences in plaintiff's favor, the Court has determined that disputed questions of material fact exist as to whether defendants breached the confidentiality provisions of the contract in the course of the 2004 purchase and, therefore, summary judgment is unwarranted on this particular ground.

### A. The Contract Is Not an Exclusive Purchase Agreement and Did Not Bar the 2004 Purchase *Per Se*

#### (1) Legal Standard

As a threshold matter, the contract explicitly provides that any issue of contract interpretation shall be decided pursuant to New York law. (*See* Pl.'s Exh. 18 ("This letter of agreement will be governed by and construed in accordance with the laws of the State of New York ...").)

According to New York law, in interpreting a contract, "words and phrases .... should be given their plain meaning," and the contract "should be construed so as to give full meaning and effect to all of its provisions." *Shaw Group, Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir.2003) (citation and internal quotation marks omitted). "[A]n interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if possible.'" *Id.* at 124 (quoting *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir.1992) (internal quotation marks omitted)). "Parties to a contract may not create an ambiguity merely by urging conflicting interpretations of their agreement." *Sayers v. Rochester Tel. Corp. Supplemental Mgt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) (citations omitted). The contract terms are not ambiguous if the terms have "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and ... there is no reasonable basis for a difference of opinion" concerning them. *Id.* (quoting *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978)).

An unambiguous contract contains language that has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir.1993) (internal quotation marks and citations omitted). In other words, "[a] contract is not ambiguous where there is no reasonable basis for a difference of opinion." *Red Rock Commodities v. Standard Chartered Bank*, 140 F.3d 420, 424 (2d Cir.1998). "The proper interpretation of an unambiguous contract is a question of law for the court,

and a dispute on such an issue may properly be resolved by summary judgment." *Omni Quartz v. CVS Corp.*, 287 F.3d 61, 64 (2d Cir.2002). However, "when the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot be resolved on a motion for summary judgment." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 205 (2d Cir.2005) (citation and internal quotation marks omitted). "Whether a contractual provision is ambiguous is a threshold question of law to be determined by the court. If a court determines that a contractual provision is ambiguous, the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." *Ocean Partners, LLC v. N. River Ins. Co.*, 546 F.Supp.2d 101, 110 (S.D.N.Y.2008) (citation and quotation marks omitted). Further, the court may "consider extrinsic evidence such as the parties' course of conduct throughout the life of the contract." *N.Y. State Law Officers Union v. Andreucci*, 433 F.3d 320, 332 (2d Cir.2006). Courts

have specifically held that "[w]here the contractual language is subject to more than one reasonable meaning and where extrinsic evidence of the parties' intent exists, the question of the proper interpretation should be submitted to the trier of fact." *TeeVee Toons, Inc. v. DM Records, Inc.*, No. 05 Civ. 5602(JGK), 2007 WL 2851218, at *6 (S.D.N.Y. Sept. 27, 2007) (collecting cases).

### (2) Application

■ For the reasons set forth below, the Court agrees with defendants that, according to its unambiguous, plain terms, the contract did not establish an exclusive relationship between Analect and defendants that precluded defendants from purchasing SVSA BOLI for their own account from a third party. Rather, the contract pertained to defendant's potential *distribution* of SVSA BOLI *to* third parties.[2] Because the contract is so clear and unambiguous, the Court has not considered any extrinsic evidence and, as set forth below, has determined as a matter of law that the 2004 purchase, in itself, did not constitute a breach of the contract.[3]

---

2. As described *infra*, the contract also contained confidentiality provisions regarding defendants' use of "Information" provided by Analect regarding SVSA BOLI.

3. The Court notes that, in any event, the extrinsic evidence in this case overwhelmingly demonstrates that the parties never intended the contract to restrict defendants' purchase of SVSA BOLI for their own account, but merely intended the contract to address a potential distribution relationship. In particular, although the Court has not considered such extrinsic evidence for purposes of the instant motion because the contract is clear and unambiguous, the Court recognizes that the record contains—*inter alia*—the following evidence that, in the context of the entire record in this case, clearly belies Analect's interpretation of the contract: (1) Eisler's testimony that, according to his personal recollection of the May 2001 meeting, Analect "probably [did] not" discuss whether "Ana-

lect viewed any purchase by Fifth Third for its own account to be the subject of any agreement it would have Fifth Third sign with them with respect to Analect's SVSA BOLI product" (Eisler Dep. at 85); (2) Eisler's concession that materials Analect sent to Fifth Third regarding BOLI did not refer to any such restriction (*see, e.g.,* Eisler Dep. at 136–37); (3) the testimony of Analect executive Douglas Hester that, subsequent to the May 2001 meeting, Eisler reported to Hester that "a meeting had occurred and they were working towards a distribution relationship. And I think that's about all" (Hester Dep. at 87); (4) an email sent to Fifth Third from Eisler after the May 2001 meeting, in which he stated: "We thought the meeting was very effective at explaining the value of our structure and product to your community bank clients...." (Defs.' Exh. 29); and (5) O'Keefe's testimony that, after the May 2001 meeting, he did not recall "telling anyone at Fifth Third that [he] understood the letter agreement between the

In arguing that the contract was an exclusivity agreement, plaintiff points to the following language, as described *supra*:

> neither we, nor any of our affiliates or Representatives, will (or will assist others to) develop, market, underwrite, distribute, coordinate the placement, administer or offer to any person, the Product or any product similar thereto without the prior written agreement of the Company.

Specifically, at oral argument, plaintiff pointed to the phrase "coordinate the placement" and argued that this phrase, in the particular context of SVSA BOLI products, encompasses the 2004 purchase. Plaintiff essentially urges the Court to interpret the phrase "coordinate the placement" to be coextensive with "purchase for oneself"—or, for that matter, "distribute to oneself." The Court, however, will not adopt such a strained interpretation in light of the contract's plain and unambiguous terms. In particular, after carefully reviewing the contract in an attempt to give full meaning and effect to all of its provisions, the Court concludes that the contract, including the provision above, pertains solely to distribution to third parties, and does not encompass defendants' purchasing SVSA BOLI for their own account.

As a threshold matter, the contract explicitly states at its outset that it was executed "in connection with [defendants'] consideration of acting as a potential life insurance product distributer [sic] ... and possibly providing other services, in connection with the Company's distribution...." Moreover, nowhere in the contract does the word "purchase" (or any similar word) appear. Rather, the contract repeatedly refers to "distribution" and to defendants' anticipated role as a "distributer [sic]" on Analect's behalf. In light of this failure even to suggest that the contract encompasses defendants' purchase of SVSA BOLI for their own account, the Court will not needlessly stretch the phrase "coordinate the placement" (or any of the other, above-referenced related terms in the contract) to encompass the 2004 purchase or similar transactions.[4] Indeed, as discussed during a hypothetical at oral argument, the Court observes that Analect's interpretation of the contract's language would lead to the analogously absurd conclusion that, if a beverage distributor signed an agreement with a soda manufacturer with language identical to the contract at issue here—*i.e.*, that precluded the soda distributor from "coordinating the placement" of soda without the manufacturer's written consent—subsequently purchased soda for the distributor's own employees from a different manufacturer, the distributor would be in breach of its agreement. In essence, Analect seeks to transform a contract that was explicitly and unambiguously entered into for purposes of engaging in a manufacturer/distributor relationship into an exclusive purchase agreement. New York's doctrine of contract interpretation, however, precludes such a linguistic leap. The

---

parties to prohibit Fifth Third from purchasing an SVSA BOLI product for its own account without using Analect...." (O'Keefe Dep. at 75).

**4.** To the extent plaintiff also argues that other terms in the contract encompass defendants' conduct, such claims are similarly without merit. For example, plaintiff suggests that by purchasing SVSA BOLI for their own account, defendants were "assisting" others in distribution. However, defendants' purchase for their internal accounts cannot possibly be encompassed in the plain meaning of such terms. Similarly, none of the other terms, according to their plain meaning (especially in light of the contract as a whole), could be interpreted as precluding the purchase by defendants of SVSA BOLI for their internal accounts.

Court, therefore, rejects plaintiff's argument that defendants breached the contract by engaging in the 2004 purchase. The contract simply does not bar defendants from purchasing SVSA BOLI for defendants' own account.[5] *Argus Research Group, Inc. v. Argus Media, Inc.,* 562 F.Supp.2d 260, 269–270 (D.Conn.2008) ("Especially in light of the fact that both parties here are sophisticated corporations that were represented by counsel during negotiations, the Court will not read an ambiguity into the contract on the basis of Argus Research's argument.... Had Argus Research desired to limit Argus Media's use of the 'PETROLEUM ARGUS' and 'ENERGY ARGUS & Design' marks, it could easily have accomplished that goal by including language in the Agreement to that effect. That Argus Research, represented by counsel, did not do so is telling. The Court will not rewrite the parties' Agreement for them.").

### B. Confidentiality

 In addition, Analect argues that defendants breached the confidentiality provisions of the contract, described above. In particular, plaintiff alleges that defendants "used ... Information" in contravention of such provisions during the course of the 2004 purchase. In support of their motion, defendants argue that no such "use" occurred because (1) Analect never transmitted "Information" to defendants; and (2) defendants never employed such Information during the 2004 purchase. However, after carefully reviewing the record in the light most favorable to plaintiff, and drawing all reasonable inferences in its favor, the Court has concluded that disputed questions of material fact exist as to both of defendants' arguments

and, therefore, summary judgment relating to the alleged breach of confidentiality is unwarranted.

With respect to the first issue—namely, whether Analect transmitted "Information" to defendants—plaintiff points, *inter alia,* to the following portions of Eisler's deposition testimony to demonstrate that such transmission occurred: (1) Eisler's testimony that, at the May 2001 meeting, Analect and Fifth Third "talked about the amount of business [Analect has] done. We talked probably about ... about other distribution relationships that we had...." (Eisler Dep. at 60); (2) Eisler's testimony that, at the May 2001 meeting, Analect disclosed confidential names of its distribution partners (Eisler Dep. at 61); (3) Eisler's testimony that, at the May 2001 meeting, Analect disclosed "how much SunLife/Analect charged for the product without distribution, which is obviously a very sensitive subject (Eisler Dep. at 63); and (4) Eisler's testimony that he provided numerous documents to defendants including an SVSA BOLI "universal sort of template presentation" (Eisler Dep. at 126), a sample announcement for defendants to circulate to their clients regarding SVSA BOLI (Eisler Dep. at 166–67), draft documents relating to SVSA BOLI, such as a "group policy form," "the group certificate form," "the maturity extension rider," "the war/terrorism rider," and "the private placement memorandum" (Eisler Dep. at 179). The Court is aware that defendants have pointed to evidence suggesting that the aforementioned documents and data were publicly available or that Analect had made similar disclosures to other entities and that, therefore, these documents and data were not confidential

---

**5.** Because the Court thus finds that the contract does not contain an exclusivity provision, the Court will not address defendants' argument that such a provision would contravene Federal Banking Regulations or public

policy. Further, because the Court will not address this latter issue, the Court need not address plaintiff's motion to exclude the September 10, 2007 report of Charles C. Morgan.

"Information" within the ambit of the contract. However, after carefully reviewing the record in the light most favorable to plaintiff, and drawing all reasonable inferences in its favor, the Court has determined that a rational juror could find that at least some of these documents and data constituted Information under the contract and, therefore, the Court cannot conclude as a matter of law that no such Information was transmitted.[6]

With respect to the second issue—namely, whether defendants employed any such Information during the 2004 purchase—plaintiff points to the following evidence: (1) during the deposition testimony of Frank Bitzer ("Bitzer"), an employee of Fifth Third who worked on the 2004 purchase, Bitzer acknowledged that he had previously reviewed materials from Analect (Bitzer Dep. at 32); and (2) on October 11, 2001, Gaylon Beckemeyer ("Beckemeyer") of Fifth Third made a presentation to various Fifth Third employees regarding BOLI products and, according to Bitzer, Beckemeyer had previously spoken to Bitzer about defendants' "effort to market a BOLI product" vis a vis Analect (Bitzer Dep. at 35–36). On the basis of this evidence, plaintiff infers that "it is entirely possible that the knowledge Fifth Third gained from Analect was used (consciously or unconsciously) in connection with" the 2004 purchase. (Pl.'s Mem. at 21.) Again, the Court is aware that defendants have pointed to evidence suggesting that they did not use "Information" during the 2004 purchase. However, after reviewing the record in its entirety in the light most favorable to plaintiff—and drawing all reasonable inferences in plaintiff's favor—the Court concludes that a rational juror could find that defendants "used ... Information" received from Analect in the course of the 2004 purchase. Accordingly, the Court declines to conclude as a matter of law that such "use" of "Information" did not occur.

In sum, the Court concludes that summary judgment is unwarranted as to whether defendants breached the confidentiality provisions of the contract. *See Dreamcatcher Software Development, LLC v. Pop Warner Little Scholars, Inc.*, 298 F.Supp.2d 276, 284 (D.Conn.2004) (denying summary judgment on breach of contract claim based on confidentiality provision

---

**6.** The Court notes that defendants also move for summary judgment on the basis that the contract is void for lack of consideration. In particular, defendants argue that they never received "Information" as promised in the contract. However, because the Court concludes that disputed questions of material fact preclude summary judgment regarding the transmission of confidential "Information" to defendants, the Court also declines to conclude as a matter of law that the contract fails for lack of consideration. Relatedly, the Court rejects defendants' argument that they are entitled to summary judgment because any money damages to which plaintiff would be entitled for breach of contract are too "speculative," in that plaintiff and defendants never entered into a definitive distribution agreement. It is beyond cavil that, to the extent a jury finds that defendants breached the confidentiality provisions of the contract and utilized valuable, confidential "Information" provided by Analect for defendants' personal gain, plaintiff may be entitled to some amount of money damages. Indeed, the contract explicitly anticipates the availability of money damages, stating: "Money damages would not be a sufficient remedy for any violation of the terms of this letter agreement and, accordingly, the Company will be entitled to specific performance and injunctive relief as remedies for any violation, in addition to all other remedies available at law or equity." Under these circumstances, the purportedly "speculative" nature of any damages award in this case does not provide grounds for summary judgment. Moreover, the Court declines to "decide now," as defendants urge, the payment schedule for any damages award. (Defs.' Mem. at 27–28.) If they wish, defendants may renew such request at the close of evidence in this case.

where defendant claimed that no confidential information was transmitted from plaintiff to defendant because the "court conclude[d] that there is a question of fact as to whether information of this type was revealed. . . .").[7]

### V. Claims against the Bancorp

■ As an additional basis for summary judgment, defendants also argue that all claims against the Bancorp fail as a matter of law because the Bancorp was neither a party to nor bound by the contract. For the reasons set forth below, the Court agrees and dismisses the Bancorp from this action.

■ " 'It is a general principal [sic] of corporate law deeply ingrained in our economic and legal systems that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries.' " *Pacho v. Enter. Rent–A–Car Co.*, 572 F.Supp.2d 341, 351 (S.D.N.Y. 2008) (quoting *United States v. Bestfoods*, 524 U.S. 51, 61, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998)). In fact, under New York law, and as the Second Circuit has recognized, a plaintiff must demonstrate one of the following two exceptional circumstances in order to pierce the corporate veil and permit liability of the parents on behalf of its subsidiary: " '(i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil.' " *Parnell v. Tremont Capital Mgmt., Corp.*, 280 Fed.Appx. 76, 77–78 (2d

Cir.2008) (quoting *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir.1997)).

Here, it is undisputed that the sole signatories to the contract were Fifth Third Insurance Services, Inc. and Fifth Third (Chicago), which are subsidiaries of the Bancorp. It is also undisputed that only the entities Fifth Third (Michigan) and Fifth Third (Ohio) actually engaged in the 2004 purchase. Indeed, it is undisputed that the Bancorp does not even have employees. Although Analect attempts to argue that the Bancorp is liable under the contract because it allegedly uses, from time to time, the generic name "Fifth Third Bank," and because certain executives were under the impression that the Bancorp would be held liable under the contract, such alleged use of a name or subjective understanding does not transform the Bancorp into a signatory of the contract. *See Int'l Customs Assocs. v. Ford Motor Co.*, 893 F.Supp. 1251, 1256 (S.D.N.Y.1995), *aff'd* 201 F.3d 431 (2d Cir. 1999), *cert. denied* 530 U.S. 1264, 120 S.Ct. 2723, 147 L.Ed.2d 987 (2000) (holding that parent company could not be liable under contract signed by subsidiary where parent company did not sign contract). The only potential liability for a nonsignatory such as the Bancorp would be under a "piercing the veil" theory, which is unsupported in the instant case. Analect does not even attempt to argue that the record contains evidence warranting veil piercing here and, in any event, the Court's careful review of the record also reveals no such evidence. Under these circumstances, the Court grants summary judgment to defendants as to all claims against the Bancorp and dismisses it from this action.[8]

---

**7.** With respect to defendants' so-called "counterclaims," the Court observes, as a threshold matter, that defendants appear simply to request that the Court grant declaratory judgment as to each of defendants' legal and factual arguments in support of the instant motion. The purpose or necessity of such "counterclaims" notwithstanding, sum-

mary judgment is denied on these counterclaims for the reasons set forth *supra*.

**8.** Defendants also argue that the Court should limit Analect's damages, as a matter of law, to Fifth Third (Michigan)'s conduct relating to the 2004 purchase—as opposed to the conduct of Fifth Third (Ohio) because, even

## VI. Conclusion

For the reasons set forth above, the Court grants in part and denies in part defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Specifically, the motion is granted with respect to (1) plaintiff's breach of contract claim, only to the portion of the claim that is based on the assertion that the contract precluded the 2004 purchase *per se;* and (2) all claims against the Bancorp. The motion ·is denied on all other grounds.

SO ORDERED.

though Fifth Third (Ohio) also participated in the 2004 purchase, Fifth Third (Ohio) is a party neither to the contract nor this lawsuit. The Court agrees with defendants that Analect may not, by means of the instant lawsuit, obtain damages *from* Fifth Third (Ohio) because it is not a party to this lawsuit. Nevertheless, it is beyond cavil that, to the extent a jury finds that Fifth Third (Michigan) passed confidential "Information" to Fifth Third (Ohio) and, thereby, played a role in Fifth Third (Ohio)'s participation in the 2004 purchase, Fifth Third (Michigan) may be liable for damages (depending on the proof), caused by a wrongful transmission of such "Information" to Fifth Third (Ohio). Thus, although plaintiff cannot recover damages from Fifth Third (Ohio), the Court declines to rule on summary judgment that plaintiff cannot recover damages from defendants for any breach of the confidentiality agreement that is proven with respect to defendants' interaction with Fifth Third (Ohio).